137 P.3d 844 (2006)
Kenneth McCLARTY, Respondent,
v.
TOTEM ELECTRIC, Petitioner.
No. 75024-6.
Supreme Court of Washington, En Banc.
Argued January 19, 2005.
Decided July 6, 2006.
*845 William G. Jeffery, Elisabeth Anne Kranz, The Jeffery Group PLLC, Seattle, for Petitioner/Appellant.
Daniel Foster Johnson, Short Cressman & Burgess, Anne-Marie E. Sargent, Connor & Sargent PLLC, Seattle, for Appellee/Respondent.
John Stephen Riper, Stanislaw Ashbaugh LLP, Seattle, for Amicus Curiae (Associated General Contractors of Washington.)
Jeffrey Lowell Needle, Maynard Building, Seattle, for Amicus Curiae (Washington Employment Lawyers Assoc.)
Richard D Reed, Seattle, for Amicus Curiae (Washington Employment Lawyers Assoc.)
J.M. JOHNSON, J.
¶ 1 Totem Electric seeks review of a Court of Appeals decision reversing the summary judgment dismissal of a disparate treatment discrimination claim brought by a former employee, Kenneth McClarty (McClarty). The central issue is the definition of "disability" *846 within the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. For the reasons stated herein, we reverse and remand for the trial court to apply the definition stated herein to the facts in this case.

FACTS
¶ 2 McClarty had been a residential electrician for approximately 20 years when he decided to move into industrial/commercial electrical work. In March 1998, he began a five-year apprenticeship program with the Tacoma-based Southwest Washington Electrical Joint Apprenticeship Training Program, which combined classroom instruction and on-the-job training.[1] On April 17, 1998, McClarty's union, Local 76 of the International Brotherhood of Electrical Workers, dispatched him to Totem Electric, the electrical subcontractor on the Old Tumwater High School renovation project. He worked there until his termination three months later. McClarty performed various duties, including using a jackhammer and shovel to level trenches dug by a backhoe, installing plastic pipe through which wires were pulled, organizing material in on-site trailers, and doing rough-in work for the school's classrooms. From July 7 until July 31, McClarty worked at leveling trenches and laying plastic pipe.
¶ 3 McClarty testified that he told his foreman that he was experiencing pain in his hands and asked for a break from digging. Totem Electric asserts that McClarty mentioned this problem for the first time on July 28, when he reported that his hands hurt from the digging and they fell asleep at night. Totem Electric told him to consult a doctor.
¶ 4 On July 30, 1998, Samuel E. Coors, D.O., diagnosed McClarty with bilateral carpal tunnel and specified work restrictions for an estimated six-month period. The restrictions required that "[r]epeated push/pull," "[r]epeated simple grasp," and "[r]epeated fine manipulation"were not to exceed 33 percent of an eight-hour workday. Clerk's Papers (CP) at 56. The following day McClarty gave Totem Electric the "Doctor's Release for Work." That same day, Totem Electric gave McClarty a written termination notice identifying the reason for the termination as a "Reduction in work forces/lay-off." CP at 57.
¶ 5 McClarty testified that the project foreman, Rick Sare, told him that the carpal tunnel diagnosis was the basis for the layoff. Sare testified that the remaining work on the project required the restricted hand and wrist movements and that, in any case, McClarty's work performance had been poor. The week following McClarty's termination, Totem Electric hired two apprentices dispatched by the same union, at lower rank and pay.
¶ 6 McClarty had received a work evaluation from that program dated July 22, 1998, rating his overall "knowledge of the trade and performance on the job" as "Below Average." CP at 122. Two additional evaluations from the program, dated August 25, 1998, assigned overall ratings of "Below Average" and the lowest possible rating, "Unsatisfactory." CP at 120, 121. McClarty was also terminated from the joint apprenticeship program by letter dated September 23, 1998.
¶ 7 McClarty, acting pro se, filed a complaint in July 2001 in Thurston County Superior Court against Totem Electric and against his union, Local 76, alleging unfair employment practices in violation of RCW 49.60.180 and .190, retaliatory practices in violation of RCW 51.48.025, wrongful termination, and breach of contract. Local 76 removed the matter to the United States District Court for the Western District of Washington, which dismissed all of McClarty's claims against Local 76 in December 2001 and remanded the remaining state claims to superior court.[2]
¶ 8 In January 2002, the trial court denied McClarty's motion for partial summary judgment on the issue of Totem Electric's employment discrimination. Totem Electric moved for summary judgment in August *847 2002, seeking dismissal of the three remaining claimsdisability discrimination under RCW 49.60.180, retaliatory discharge under RCW 51.48.025, and wrongful termination. McClarty conceded that the retaliation claim should be dismissed but contested the summary judgment. In October 2002, the trial court granted Totem Electric's motion, dismissing McClarty's complaint in its entirety and awarding Totem Electric its costs and statutory fees.
¶ 9 The Court of Appeals affirmed the grant of summary judgment on McClarty's accommodation claim, but reversed the grant of summary judgment on his disparate treatment claim and remanded the case for further proceedings, deferring the issue of attorney fees until the ultimate prevailing party could be determined by the trial court on the merits. McClarty v. Totem Elec., 119 Wash.App. 453, 473, 81 P.3d 901 (2003).
¶ 10 We granted Totem Electric's petition for review "only as to the issue regarding the definition of disability in disparate treatment claims" and "the issue presented by [McClarty] regarding attorney fees." Wash. State Supreme Court Order, McClarty v. Totem Elec., 152 Wash.2d 1011, 99 P.3d 895 (2004). We denied McClarty's cross-petition for review of the dismissal of his accommodation claim.[3]

ISSUES
¶ 11 (1) In disability discrimination suits brought under the WLAD, what is the appropriate definition of "disability" to be applied?
¶ 12 (2) Did the Court of Appeals properly conclude that under the WLAD any award of attorney fees on appeal must be deferred until the prevailing party has been determined by the trial court on the merits?

ANALYSIS
¶ 13 To provide for a single definition of "disability" that can be applied consistently throughout the WLAD, we adopt the definition of disability as set forth in the federal Americans with Disabilities Act of 1990(ADA), 42 U.S.C. §§ 12101-12209. We hold that a plaintiff bringing suit under the WLAD establishes that he has a disability if he has (1) a physical or mental impairment that substantially limits one or more of his major life activities, (2) a record of such an impairment, or (3) is regarded as having such an impairment.

A. Standard of Review

¶ 14 "When reviewing an order of summary judgment, this Court conducts the same inquiry as the trial court." Pulcino v. Fed. Express Corp., 141 Wash.2d 629, 639, 9 P.3d 787(2000). Summary judgment is appropriate only when, after reviewing all facts and reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982). "All questions of law are reviewed de novo." Berger v. Sonneland, 144 Wash.2d 91, 103, 26 P.3d 257 (2001).

B. Unlawful Termination: Disparate Treatment Claim

¶ 15 In Washington, an employer generally has the common law right to terminate an employee "for no cause, good cause or even cause morally wrong without fear of liability." Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 226, 685 P.2d 1081 (1984). The WLAD represents a statutory exception to this rule barring race, sex, disability, and other enumerated characteristics from providing a basis for hiring or discharge.[4]
*848 ¶ 16 As applicable here, the WLAD forbids an employer from discharging an employee because of the presence of any sensory, mental, or physical disability. RCW 49.60.180(2). The WLAD also forbids an employer from discriminating against an employee in compensation or in other terms or conditions of employment because of any sensory, mental, or physical disability. RCW 49.60.180(3). RCW 49.60.180(1) prohibits refusing to hire on the same grounds.
¶ 17 The legislature first enacted the WLAD in 1949 to eliminate racial discrimination in employment. See LAWS OF 1949, ch. 183; REM. REV. STAT. § 7614 (Supp. 1949). The statute was extended to prohibit discrimination against "handicapped" persons in 1973. See LAWS OF 1973, 1st ex. sess., ch. 214.
¶ 18 The Federal Rehabilitation Act of 1973 (29 U.S.C. § 701), a precursor to the federal ADA, was passed in the same year. When the federal ADA was adopted in 1990, it used the term "disability" instead of "handicapped." We have concluded that the use of the term "disability" has evolved to the point that its definition in the federal statute and in Washington's should be the same.
¶ 19 In 1993, the legislature amended the WLAD, replacing all uses of the term "handicap" with the term "disability." See LAWS OF 1993, ch. 510. In our jurisprudence the terms "handicap" and "disability" are interchangeable. Hill v. BCTI Income Fund-I, 144 Wash.2d 172, 191 n. 17, 23 P.3d 440 (2001).
¶ 20 The WLAD makes it unlawful for an employer, "[t]o expel from membership any person because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical disability ...." RCW 49.60.190(2). These provisions give rise to disability discrimination claims under two theoriesdisparate treatment and failure to accommodate. "`An employer who discharges, reassigns, or harasses for a discriminatory reason faces a disparate treatment claim; an employer who fails to accommodate the employee's disability, faces an accommodation claim.'" Pulcino, 141 Wash.2d at 640, 9 P.3d 787 (quoting Hill v. BCTI Income Fund-I, 97 Wash. App. 657, 667, 986 P.2d 137 (1999).)
¶ 21 Of central importance here, the legislature has never found it necessary to define the terms "handicap" or "disability" within the WLAD.[5] Unfortunately, and with confusing result, applications of the same term "disability" have led to different definitions, depending on type of claim. We shall attempt to reconcile these differences.
¶ 22 In 1975, however, the Washington State Human Rights Commission (HRC) did adopt a regulation to define "handicap," which it later amended several times. As amended, the regulation provides that:
(1) "Disability" is short for the statutory term "the presence of any sensory, mental, or physical disability," except when it appears as part of the full term.
(2) "The presence of a sensory, mental, or physical disability" includes, but is not limited to, circumstances where a sensory, mental, or physical condition:
(a) Is medically cognizable or diagnosable;
(b) Exists as a record or history;
(c) Is perceived to exist whether or not it exists in fact.
A condition is a "sensory, mental, or physical disability" if it is an abnormality and is a reason why the person having the condition did not get or keep the job in question, or was denied equal pay for equal work, or was discriminated against in other terms and conditions of employment, or was denied equal treatment in other areas covered by the statutes. In other words, for enforcement purposes a person will be considered to be disabled by a sensory, mental, or physical condition if he or she is discriminated against because *849 of the condition and the condition is abnormal.
WAC 162-22-020 (emphasis added) (codifying as amended HRC Order 23, § 162-22-020 (filed July 21, 1975)). This WAC was flawed (as well as unduly complicated).
¶ 23 Just one year later, this court did not utilize this HRC definition of "handicap" in deciding a vagueness challenge to RCW 49.60.180.[6]See Chic., Milwaukee, St. Paul & Pac. R.R. Co. v. Wash. State Human Rights Comm'n, 87 Wash.2d 802, 805-06, 557 P.2d 307 (1976). This court relied on the plain and ordinary meaning of the term "handicap" as set forth in the dictionary. "A disadvantage that makes achievement unusually difficult; esp: a physical disability that limits the capacity to work." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1026 (1961).
¶ 24 Nearly 20 years later, we again expressly acknowledged that the HRC regulation was problematic. Doe v. Boeing Co., 121 Wash.2d 8, 15, 846 P.2d 531 (1993). We specifically noted that the regulation was circular: it required a factual finding that the plaintiff was discriminated against "because of the condition in order to determine whether the condition is a `handicap.'" Id.
¶ 25 In Pulcino, seven years later, we concluded that the circularity of WAC 162-22-020 rendered it unworkable in the context of accommodation cases. We reasoned that
[t]he employee would ... have to prove that the employer failed to accommodate the employee (i.e., discriminated against him or her) because of the employee's abnormal condition. This implies that the employer accommodates other employees; but, obviously, employees who are not disabled do not require such accommodation.
Pulcino, 141 Wash.2d at 641, 9 P.3d 787.
¶ 26 Accordingly, Pulcino defined "disability" to require a claimant to prove that (1) he or she has or had a sensory, mental, or physical abnormality, and (2) the abnormality has or had a substantially limiting effect on his or her ability to perform the job. Id. We further provided that "[a]n employee can show that he has a sensory, mental or physical abnormality, by showing that he or she has a condition that is medically cognizable or diagnosable, or exists as a record or history." Id.
¶ 27 A year later in Hill, we reinforced our reasoning in Pulcino, observing that the circularity of WAC 162-22-020
makes it impossible for plaintiffs to satisfy their first intermediate evidentiary burden without simultaneously producing evidence in support of their ultimate allegation, namely, that the adverse action occurred because of that alleged "disability."
Hill, 144 Wash.2d at 192 n. 19, 23 P.3d 440. While acknowledging that the case did not require us to decide whether Pulcino should be applied to all disability discrimination cases, we noted that we were "greatly troubled" by WAC 162-22-020, seeing "no principled reason why it should be fundamentally harder to establish prima facie cases of disability discrimination under RCW 49.60.180 than prima facie cases of any other form of discrimination made unlawful by [the WLAD]." Hill, 144 Wash.2d at 192 n. 19, 23 P.3d 440.[7] It appears that we would have applied a single definition to both claims had Hill properly preserved her disparate treatment claim. Id. at 193 n. 20, 23 P.3d 440.
¶ 28 The most obvious problem with WAC 162-22-020 is that its definition of "disability" is at odds with the plain meaning of the term. Where, as here, a statute fails to define a term, rules of statutory construction require us to give the term its plain and ordinary meaning, which we derive from a *850 standard dictionary if possible. Schrom v. Bd. for Volunteer Fire Fighters, 153 Wash.2d 19, 28, 100 P.3d 814 (2004). See also One Pac. Towers Homeowners' Ass'n v. HAL Real Estate Invs., Inc., 148 Wash.2d 319, 330, 61 P.3d 1094 (2002) (stating that we should also keep in mind the context of the statute as a whole and the intent of the legislature).
¶ 29 Bearing this in mind, we earlier relied on the plain meaning of the term "handicap" in rejecting a vagueness challenge to RCW 49.60.180:
Men of common intelligence need not guess at the meaning of "handicap" because it has a well defined usage measured by common practice and understanding. "Handicap" commonly connotes a condition that prevents normal functioning in some way. A person with a handicap does not enjoy, in some manner, the full and normal use of his sensory, mental, or physical faculties. A "handicap" is: "... a disadvantage that makes achievement unusually difficult; esp: a physical disability that limits the capacity to work." Webster's Third New International Dictionary (1961). It is obvious that "handicap" has a well understood, common meaning. Men of ordinary intelligence undoubtedly can understand what constitutes a "handicap" within the context of RCW 49.60.180(1)....
Chic., Milwaukee, St. Paul & Pac. R.R. Co., 87 Wash.2d at 805-06, 557 P.2d 307 (citations omitted) (emphasis added).
¶ 30 The 1993 substitution of "disability" for "handicap" in the WLAD did not change this common sense conclusion. "Disability" means the "inability to do something." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 642 (2002). Specifically, it includes "a physical or mental illness, injury, or condition that incapacitates in any way." Id. Given this definition, a disability discrimination claimant should be required "to show that his condition substantially limited his ability to perform" something before he is deemed disabled under the WLAD. McClarty, 119 Wash.App. at 470, 81 P.3d 901. The United States Supreme Court has come to the same conclusion.
¶ 31 That the regulation definition of "disability" contravenes the purpose of the WLAD was not the only problem. WAC 162-22-020 also conflicts with much of our antidiscrimination jurisprudence because the regulation would require a disability discrimination plaintiff to prove that he has been discriminated against because of his condition to prove that he is "disabled" in the first place. As acknowledged in the Court of Appeals decision below, this requirement destroys the McDonnell Douglas burden-shifting scheme because it forces a plaintiff to prove the ultimate fact of discrimination simply to make a prima facie case. McClarty, 119 Wash.App. at 467, 81 P.3d 901. See also Hill, 144 Wash.2d at 192 n. 19, 23 P.3d 440.
¶ 32 This burden violates the legislature's command that the provisions of the WLAD be liberally construed, RCW 49.60.020, and is inconsistent with the burdens placed upon plaintiffs in other types of discrimination cases. See, e.g., Hill, 144 Wash.2d at 181, 23 P.3d 440 (noting that a prima facie case of racial discrimination requires plaintiff to show simply, inter alia, "that [the plaintiff] belongs to a racial minority.").
¶ 33 This analysis requires us to discard the regulation definition, as we did in Pulcino and Hill. Cf. In re Parentage of C.A.M.A., 154 Wash.2d 52, 67, 109 P.3d 405 (2005); Griffin v. Eller, 130 Wash.2d 58, 69-70, 922 P.2d 788 (1996).
¶ 34 Previous definition efforts have also failed because they result in defining "disability" to include any medically cognizable abnormality. Such a definition is far broader than the plain and ordinary meaning of the term "disability" and cannot be supported by the text of the statute or the history underlying it.
¶ 35 The WLAD speaks in terms of "disability," not of "medical condition." Cf. Chai R. Feldblum, Definition of Disability Under Federal Anti-Discrimination Law: What Happened? Why? And What Can We Do About It?, 21 BERKELEY J. EMP. & LAB. L. 91, 101-02 (2000).[8] Furthermore, "`[i]t is *851 doubtful that any legislature intended, or even envisioned, that its handicapped discrimination laws would be interpreted to address the problems associated with a sprained finger or ankle.'" Pulcino, 141 Wash.2d at 661-62, 9 P.3d 787 (Madsen, J., dissenting) (quoting 3A ARTHUR LARSON & LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 107.32(c), at 22-131 (1991)).[9] Illustrating this point, counsel for amicus Washington Employment Lawyers' Association (WELA) conceded at argument that, under the definition in WAC 162-22-020, a receding hairline could constitute a disability. See Wash. State Supreme Court oral argument at 55:30, McClarty v. Totem Elec., No. 75024-6 (Jan. 19, 2005), audio recording by TVW, Washington State's Public Affairs Network, available at http://www.tvw.org. Such an extension "trivializes the discrimination suffered by persons with disabilities." Pulcino, 141 Wash.2d at 652, 9 P.3d 787 (Madsen, J., dissenting).
¶ 36 The Pulcino definition also had difficulties. As McClarty and WELA argue, some obviously disabled, e.g. the blind or the paraplegic, may not be considered disabled under a strict reading of the Pulcino definition. They suggest, for example, that a paraplegic applying for a position that did not require mobility might not be considered disabled under Pulcino because the medical condition would not have a substantially limiting effect on his ability to perform that job. In addition, beyond defining "disability," Pulcino may confusingly conflate the concept of disability with elements of a failure to accommodate claim. As a result, it is difficult to apply the Pulcino definition outside the accommodation context.
¶ 37 It is true that a court will often give weight to a statute's interpretation by the agency which is charged with its administration. Marquis v. City of Spokane, 130 Wash.2d 97, 111, 922 P.2d 43 (1996). However, this court has the ultimate authority to construe statutes, Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n, 123 Wash.2d 621, 627, 869 P.2d 1034 (1994), and statutes must be given a rational and sensible interpretation, State v. Thomas, 121 Wash.2d 504, 512, 851 P.2d 673 (1993). WAC 166-22-020(2) is not a rational and sensible interpretation of the term "disability" as it is used in the WLAD, and we reject it in favor of a definition better supported by the WLAD's text, the legislature's intent and our jurisprudence.
¶ 38 To provide a single definition of "disability" that can be applied consistently throughout the WLAD, we adopt the definition of disability set forth in the federal ADA. We hold that a plaintiff bringing suit under the WLAD establishes that he has a disability if he has (1) a physical or mental impairment that substantially limits one or more of his major life activities, (2) a record of such an impairment, or (3) is regarded as having such an impairment.
¶ 39 This court has held that federal law is instructive with regard to our state discrimination laws. Dedman v. Pers. Appeals Bd., 98 Wash.App. 471, 478, 989 P.2d 1214 (1999). See also Clarke v. Shoreline Sch. Dist. No. 412, 106 Wash.2d 102, 118, 720 P.2d 793 (1986); Dean v. Mun. of Metro. Seattle, 104 Wash.2d 627, 638, 708 P.2d 393 (1985). Additionally, this court has previously used definitions given by the Equal Employment Opportunity Commission to define the ADA when deciding questions of Washington discrimination law. See Davis v. Microsoft Corp., 149 Wash.2d 521, 70 P.3d 126 *852 (2003). See also Herring v. Dep't of Soc. & Health Servs., 81 Wash.App. 1, 914 P.2d 67 (1996); Dedman, 98 Wash.App. 471, 989 P.2d 1214.
¶ 40 A physical or mental impairment that is substantially limiting impairs a person's ability to perform tasks that are central to a person's everyday activities, thus are "major life activities." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). The United States Supreme Court has held that substantially limited means "`[u]nable to perform a major life activity that the average person in the general population can perform'" id. at 195, 122 S.Ct. 681 (quoting 29 C.F.R. § 1630.2(j) (2001)) and defined major life activities as "those activities that are of central importance to daily life." Id. at 197, 122 S.Ct. 681.
¶ 41 Several considerations support the definition we give here. First, and most importantly, it is consistent with the plain meaning of the term "disability" as utilized by the legislature and the history underlying the WLAD. Second, it accords closely with the definition of the same term "disability" in the federal ADA. This is appropriate, given that the original federal and Washington laws against disability discrimination were enacted nearly contemporaneously and directed at the same issue. See also Clarke, 106 Wash.2d at 118, 720 P.2d 793 ("when Washington statutes or regulations have the same purpose as their federal counterparts, we will look to federal decisions to determine the appropriate construction.").[10][11] Finally, the proposed definition would ensure that scarce judicial resources are available to those most in need of the WLAD's protections, rather than persons with receding hairlines. This definition should avoid "trivializ[ing] the discrimination suffered by persons with disabilities." Pulcino, 141 Wash.2d at 652, 9 P.3d 787 (Madsen, J., dissenting).
¶ 42 We remand to the trial court to apply this definition to McClarty's disparate treatment claim.

C. Attorney Fees

¶ 43 Reasonable attorney fees may be awarded on appeal if applicable law grants a party the right to recover such fees or expenses on review before either the Court of Appeals or the Supreme Court. RAP 18.1(a). The WLAD allows a plaintiff in a discrimination action to recover "the cost of suit including reasonable attorneys' fees." RCW 49.60.030(2).
¶ 44 Although McClarty sought attorney fees on appeal, he now correctly concedes that courts have declined to award fees under the WLAD until the plaintiff prevails.[12] *853 McClarty also raises the issue of his entitlement to costs on appeal. "A commissioner or clerk of the appellate court will award costs to the party that substantially prevails on review, unless the appellate court directs otherwise...." RAP 14.2 (emphasis added.) Costs include statutory attorney fees and reasonable expenses that are specifically enumerated in RAP 14.3.
¶ 45 McClarty argues that he substantially prevailed on appeal because he obtained a reversal of the trial court's summary dismissal of his disparate treatment claim. Totem Electric contends that it prevailed because the dismissal of McClarty's failure to accommodate claim was affirmed on appeal.
¶ 46 McClarty and Totem Electric have each prevailed on some issues. Under such circumstances, neither party has substantially prevailed, and the parties must bear their own costs. See Nw. Television Club, Inc. v. Gross Seattle, Inc., 96 Wash.2d 973, 985-86, 640 P.2d 710 (1982). The trial court may also consider fees after disposing of the case on remand.

CONCLUSION
¶ 47 Where the legislature employs a term of common usage and chooses to define the term no further, it is the duty of this court to give effect to that meaning. Here, we have restated our legislature's understanding of these common terms in a manner consistent with comparable federal protections for those, and only those, included within these protections. This should leave this important area of law clearer in providing appropriate protection for those truly disabled.
Concurring: C. JOHNSON, MADSEN, SANDERS and BRIDGE, JJ.
ALEXANDER, C.J. (dissenting).
¶ 48 We granted review in this case to determine primarily what definition of "disability" should control for purposes of disparate treatment claims brought under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. Should it be the definition of "disability" articulated by this court in Pulcino v. Federal Express Corp., 141 Wash.2d 629, 640, 9 P.3d 787 (2000) for failure to accommodate claims or the definition of "disability" promulgated by the Washington State Human Rights Commission in WAC 162-22-020? The majority has seen fit to answer this "either/or" question by responding with an affirmative "neither." Rather than working within the confines of Washington law and jurisprudence, the majority imports the definition of "disability" set forth in the federal Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101, a definition not advocated by either party in this case. It then extends the federal ADA definition to cover failure to accommodate claims brought under the WLAD. Given that the majority opinion does not answer the question upon which we granted review, improperly disregards a properly promulgated state regulation, subjects this court to a charge of "legislating from the bench," and effectively and needlessly overturns our decision in Pulcino, I dissent.
¶ 49 Although I agree with the bulk of the dissenting opinion's analytical framework for why the WAC disability definition should be the controlling definition for disparate treatment claims, I find that I am unable to concur in the underlying holding of that opinion. Even under the dissent's new reading of the WAC definition, I believe the trial court's order dismissing on summary judgment Kenneth McClarty's disparate treatment claim should be upheld. I say that because the record establishes that McClarty fails to establish a prima facie case of disparate treatment and/or to show evidence of Totem Electric's discriminatory motive. Therefore, I write a separate dissent.[1]
*854 ¶ 50 The central issue in a disparate treatment claim is whether McClarty's employer, Totem Electric, acted with a discriminatory intent or motive. Parsons v. St. Joseph's Hosp. & Health Care Ctr., 70 Wash.App. 804, 807, 856 P.2d 702 (1993). The burden of persuasion remains with the plaintiff at all times. Hill v. BCTI Income Fund-I, 144 Wash.2d 172, 181, 23 P.3d 440 (2001) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). As a result, McClarty has to show that Totem Electric intentionally discriminated against him.
¶ 51 In order to establish a state law claim of disparate treatment discrimination, McClarty must first set forth a prima facie case of unlawful discrimination. A prima facie case of termination based on a disability is established if the claimant shows that he or she belongs to a protected class (i.e., is disabled), was discharged, was doing satisfactory work, and was replaced by someone not in the protected class. Parsons, 70 Wash. App. at 808-09, 856 P.2d 702. If the claimant in this case, McClarty, fails to make his prima facie case of discrimination, Totem Electric is entitled to "prompt judgment as a matter of law." Hill, 144 Wash.2d at 181, 23 P.3d 440 (citing Kastanis v. Educ. Employees Credit Union, 122 Wash.2d 483, 490, 859 P.2d 26, 865 P.2d 507 (1993) (citing Burdine, 450 U.S. at 254, 101 S.Ct. 1089)).
¶ 52 Applying the WAC definition as articulated by the dissent, and taking the evidence considered by the trial court and all reasonable inferences therefrom, I conclude that McClarty presented sufficient evidence in the form of a doctor's release that he was diagnosed as having bilateral carpal tunnel syndrome, which would constitute a physical abnormality. Therefore, McClarty established that he was disabled as that term is used in RCW 49.60.180. In addition, there is no dispute that McClarty was discharged. McClarty failed, however, to present sufficient evidence demonstrating he was intentionally discriminated against because of his disability.
¶ 53 In support of my determination that McClarty presented insufficient evidence to survive summary judgment, I note that the record demonstrates that McClarty was not doing satisfactory work as an apprentice electrician. By his own admission, McClarty was the least skilled of the project's two apprentices, and he struggled to learn without first being shown how to do the tasks assigned to him. Due to his lack of success at learning to install conduit, McClarty had been reassigned from doing inside electrical work to work involving digging and leveling trenches and jack-hammering. Furthermore, McClarty's overall work performance on the job site was less than stellar. A work evaluation dated nine days prior to McClarty's termination rated his overall performance on the job as "below average." Clerk's Papers at 122. Finally, during a deposition, McClarty acknowledged that he received negative evaluations of his electrical work. As a result, it can be said that McClarty failed to show he was doing satisfactory work and, consequently, he does not establish as a matter of law a prima facie case of disparate treatment.
¶ 54 Even if one assumes McClarty met his initial burden of establishing a prima face case of discrimination, he fails to show that Totem Electric acted with discriminatory intent. McClarty stated in his deposition that at the time of his termination all of the ditches of any consequence had been dug. He also stated that he was in the process of filling in one of the last ditches when he received his notice of termination and that any remaining work involving digging involved less than one-third of a day. Additionally, Totem Electric provided sufficient evidence that it had no light duty work available at the time it laid off McClarty and no other work to assign him given his low skill level. Furthermore, McClarty does not present any direct evidence that his medical condition was discussed in any performance *855 review or referenced in the notice of termination. Thus, McClarty fails to present evidence establishing an improper connection between Totem Electric's employment decision and McClarty's carpal tunnel syndrome.
¶ 55 Indeed, the evidence shows that McClarty was terminated because his services were no longer needed. McClarty makes a bare assertion that Rick Sare, Totem's general foreman on the project site, told him on the day of his termination that his diagnosis of carpal tunnel syndrome was the basis for the termination. See CP at 54. Such an assertion is not, however, sufficient to establish that Totem Electric's reason for laying him off was a mere pretext for discrimination and does not give rise to a reasonable inference of discrimination. Accord Parsons, 70 Wash.App. at 811, 856 P.2d 702; Grimwood v. Univ. of Puget Sound, Inc., 110 Wash.2d 355, 361, 753 P.2d 517 (1988) (employer's summary judgment motion affirmed where plaintiff/employee's allegations of unlawful discrimination were supported only by his own affidavit and were unsupported by specific evidence).
¶ 56 The gravamen of a plaintiff's disparate treatment claim is proving the employer's discriminatory intent. See Hill, 144 Wash.2d at 186-87, 23 P.3d 440. Contrary to what McClarty asserts, the evidence here does not show that Totem Electric terminated his services for a discriminatory reason, or that the company treated McClarty in any unequal way.
¶ 57 In sum, McClarty has failed to show that there is an issue of fact for the jury and, consequently, the trial court properly granted summary judgment on McClarty's disparate treatment claim under RCW 49.60.180(2). Therefore, I would reverse the Court of Appeals, thereby affirming the decision of the trial court.
OWENS, J. (dissenting).
¶ 58 We granted review to determine whether the definition of "disability" adopted in Pulcino v. Federal Express Corp., 141 Wash.2d 629, 9 P.3d 787 (2000), for failure-to-accommodate claims should be extended to disparate treatment claims and thereby displace the definition found in WAC 162-22-020(1)-(2). Rather than answering the narrow question before us, the majority has usurped the authority of the legislature and enacted a new law, completely ignoring the recent reminder in In re Parentage of L.B., 155 Wash.2d 679, 122 P.3d 161 (2005), that "separation of powers requires a court ... to recognize that "`the drafting of a statute is a legislative, not a judicial, function.'" Id. at 718, 122 P.3d 161 (J.M. Johnson, J., dissenting) (quoting State v. Jackson, 137 Wash.2d 712, 725, 976 P.2d 1229 (1999) (quoting State v. Enloe, 47 Wash.App. 165, 170, 734 P.2d 520 (1987))). Effective with the filing of this opinion, the more restrictive definition of "disability" applied in the federal Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101, will now be the governing definition of "disability" for purposes of all disability-based discrimination suits brought under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. Because the majority's "judicial rewrite" of the WLAD contravenes legislative intent and ignores the precedents of this court, I dissent. Id. at 715, 976 P.2d 1229 (J.M. Johnson, J., dissenting).
¶ 59 Before I turn to the substantive problems with the majority opinion, the process that has given rise to that opinion bears some comment. In their briefing, neither party ever mentioned, much less advocated, the adoption of the ADA definition of "disability." Likewise failing to anticipate the majority's leap, the amici in the case, the Washington Employment Lawyers Association (WELA) and the Associated General Contractors of Washington, filed briefs that made no mention of the ADA definition. The amici appropriately confined their advice to the issue before usagain, the extension of the Pulcino definition to disparate treatment claims. Similarly, at oral argument, neither party expressed (or was ever even asked to express) an opinion as to the appropriateness of substituting the ADA definition for the definition that the legislature, in RCW 49.60.120(3), authorized the Washington State Human Rights Commission (Commission) to promulgate. When WELA's counsel was asked whether he preferred the federal definition, he resoundingly rejected the notion, *856 reminding the court that any redefinition of the scope of the statutory protection was "a quintessential kind of legislative function," not a judicial function.[1] Although the genesis of this new judge-made Washington law cannot be found in the briefing or the arguments of the parties in this case, its source is traceable to an argument that failed to persuade a majority of this court in 2000. See Pulcino, 141 Wash.2d at 652-63, 9 P.3d 787 (Madsen, J., concurring in part/dissenting in part). But the majority's revival of the Pulcino dissent does not cure the gaps in the process followed here since the parties' briefing and oral argument in Pulcino likewise included no mention of the ADA definition of "disability."
¶ 60 I find significant flaws in the majority opinion. First, the majority misstates the measure of deference owed to the Commission's interpretation of the term "disability." The Commission formulated its interpretation of "disability" at the legislature's direction: in RCW 49.60.010, the legislature conferred on the Commission "powers with respect to elimination and prevention of discrimination in employment"; in RCW 49.60.110, it required the Commission to "formulate policies to effectuate the purposes of [chapter 49.60 RCW]"; and, most significantly here, in RCW 49.60.120(3), it delegated to the Commission the duty to promulgate "suitable rules and regulations to carry out the provisions of [chapter 49.60 RCW]." In light of these statutory provisions, this court stated in Phillips v. City of Seattle, 111 Wash.2d 903, 908, 766 P.2d 1099 (1989), that "[t]he Commission's particular definition of [disability] for unfair practice claims is entitled to be given great weight as it is the construction of the statute by the administrative body whose duty it is to administer its terms." (Emphasis added.) In contrast, the majority in the present case concedes only "that a court will often give weight to a statute's interpretation by the agency ... charged with its administration." Majority at 851 (emphasis added). Oddly, the majority cites Marquis v. City of Spokane, 130 Wash.2d 97, 922 P.2d 43 (1996), a decision in which this court unequivocally stated that deference to the agency's interpretation is not at the reviewing court's option but is, rather, a requirementone that can be ignored only where the regulation unmistakably conflicts with legislative intent: "A court must give great weight to the statute's interpretation by the agency which is charged with its administration, absent a compelling indication that such interpretation conflicts with the legislative intent." Id. at 111, 922 P.2d 43 (emphasis added).
¶ 61 The majority did not give the Commission's definition "great weight," or any weight, for that matter, nor did the majority show that the Commission's definition conflicts with the legislature's intent. The legislature declared, "practices of discrimination against any of its inhabitants because of ... the presence of any sensory, mental, or physical disability ... are a matter of state concern," since "such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state," and the legislature expressly stated that the chapter's provisions "shall be construed liberally." RCW 49.60.010, .020 (emphasis added). Plainly, if the legislature had wanted the term "disability" to be narrowly, not liberally, construed in the WLAD, the legislature itself could have provided a restrictive definition in 1973, when protection against disability discrimination was first added to the WLAD. Or in 1974 the legislature could have turned to the federal Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 701, and adopted its 1974 amendment providing a definition of "disability"the prototype for the definition incorporated in the ADA in 1990. Or in the years since 1975, the year the Commission filed the WAC sections at issue here, the legislature could have taken action to limit the scope of the Commission's interpretation of "disability." In short, the majority has ignored clear precedent by discarding the Commission's definition without identifying any "compelling indication"or any indication at all-that the Commission's *857 interpretation of "disability" "conflicts with the legislative intent." Marquis, 130 Wash.2d at 111, 922 P.2d 43.
¶ 62 Having unjustifiably ignored clear precedent by minimizing the deference owed to the Commission's interpretation, the majority goes on to base its rejection of the Commission's statutory interpretation on some shaky assertions. First, the majority argues that we should ignore the Commission's definition of "disability" because "[j]ust one year [after the Commission filed its definition], this court did not utilize" it in Chicago, Milwaukee, St. Paul & Pacific Railroad v. Washington State Human Rights Commission, 87 Wash.2d 802, 557 P.2d 307 (1976). Majority at 849. The majority's implication that the Chicago, Milwaukee court considered and rejected the Commission's definition is demonstrably incorrect. Chicago, Milwaukee arose out of Robert G. Clark's application in 1973 for a job as a railroad brakeman. As part of the application process, Clark submitted a report disclosing that he had previously had surgery on each knee to remove cartilage, the first surgery having been performed in 1962 and the second in 1967. Based on the report, the railroad's chief surgeon recommended denying Clark employment, and the railroad then rejected his application in July 1973. Clark filed a complaint with the Commission in September 1973, "charging ... discrimination based on a possible physical handicap." Chicago, Milwaukee, 87 Wash.2d at 803, 557 P.2d 307. The Commission's chairman appointed a tribunal, and an evidentiary hearing was held in July 1974. In December 1974, the tribunal filed its decision, finding that the railroad "had discriminated against [Clark] on the basis of a physical handicap and had therefore committed an unfair practice within the meaning of RCW 49.60.180(1)." Id. at 804, 557 P.2d 307. The railroad appealed to superior court, and on July 2, 1975, the superior court entered its judgment "declar[ing] RCW 49.60 `void for lack of a definition of the term "handicapped."'" Id. The Commission appealed, and this court "reverse[d] the trial court's conclusion that the statute is unconstitutionally vague." Id.
¶ 63 As is evident from the foregoing summary, the railroad's vagueness challenge, as well as the trial court's vagueness determination, predated the Commission's filing of WAC 162-22-020 and -040, the sources of the Commission's interpretation of "handicap" in RCW 49.60.180. Consequently, this court's task in Chicago, Milwaukee was to determine whether the superior court had correctly concluded that the railroad's procedural due process had been violated in July 1973in other words, whether the statute was unconstitutionally vague in July 1973, when the railroad took the challenged employment action. Just as it was impossible for the trial court to consider the WAC sections (because they were not even in existence when that court made its decision), it would have been improper for this court to address the railroad's vagueness challenge (based as it was on the absence of a statutory definition in 1973) by referring to the Commission's 1975 interpretations. Thus, contrary to the majority's self-serving implication, the Chicago, Milwaukee court could not have taken "the opportunity" to apply the Commission's July 21, 1975, definition when the court reviewed the trial court's decision regarding the 1973 vagueness challenge. Majority at 849 n. 6.
¶ 64 A second argument made by the majority in the present case to justify its rejection of the Commission's interpretation of "disability" is that the definition of "disability" is "circular" because "it require[s] a factual finding that the plaintiff was discriminated against `because of the condition in order to determine whether the condition is a "handicap."'" Majority at 849 (quoting Doe v. Boeing Co., 121 Wash.2d 8, 15, 846 P.2d 531 (1993)). A look back at the regulations as originally promulgated shows that in 1975 the Commission's definition of "handicap" was placed within a broader statement of the essential elements of a disability-based discrimination claim. In the original "DEFINITIONS" section of chapter 162-22 WAC, the Commission included only two items:
"Handicap" is short for the statutory term "the presence of any sensory, mental, or physical handicap", ... except when it appears as part of the full term.

*858 An "able handicapped worker" is a person whose handicap does not prevent the proper performance of the particular job in question.
Former WAC 162-22-020 (1975). The Commission simultaneously filed WAC 162-22-040, a section entitled "GENERAL APPROACH TO ENFORCEMENT":
(1) For the purpose of determining whether an unfair practice under RCW 49.60.180, 49.60.190, or 49.60.200 has occurred:
(a) A condition is a "sensory, mental, or physical handicap" if it is an abnormality and is a reason why the person having the condition did not get or keep the job in question, or was denied equal pay for equal work, or was discriminated against in other terms and conditions of employment, or was denied equal treatment in other areas covered by the statutes. In other words, for enforcement purposes a person will be considered to be handicapped by a sensory, mental, or physical condition if he or she is discriminated against because of the condition and the condition is abnormal.
(b) "The presence of a sensory, mental, or physical handicap" includes, but is not limited to, circumstances where a sensory, mental, or physical condition:
(i) is medically cognizable or diagnosable;
(ii) exists as a record or history; or
(iii) is perceived to exist, whether or not it exists in fact.
(2) An example of subsection (1)(b)(ii) is a medical record showing that the worker had a heart attack five years ago. An example of subsection (1)(b)(iii) is rejection of a person for employment because he had a florid face and the employer thought that he had high blood pressure, but in fact he did not have high blood pressure.
Former WAC 162-22-040 (1975). As the title and first paragraph of this regulation show, the Commission was doing more than simply defining "handicap" (or "the presence of a sensory, mental, or physical handicap"). By its plain language, the regulation was intended to provide a "general approach to enforcement," a statement of what a plaintiff would have to show "for enforcement purposes." Id. (emphasis added). Former WAC 162-22-040 provided that a claim of "handicap" discrimination required proof of a "handicap" and proof of discriminatory intent arising from that condition.
¶ 65 In 1999, the Commission shifted former WAC 162-22-040(1)(a) into the "Definitions" section as WAC 162-22-020(2). When the Commission moved WAC 162-22-040, it eliminated the regulation's title, "GENERAL APPROACH TO ENFORCEMENT," as well as the general introductory statement of paragraph (1), and it reversed the order of subsections (1)(a) and (1)(b) to produce the current version of the regulation:
(2) "The presence of a sensory, mental, or physical disability" includes, but is not limited to, circumstances where a sensory, mental, or physical condition:
(a) Is medically cognizable or diagnosable;
(b) Exists as a record or history;
(c) Is perceived to exist whether or not it exists in fact.
A condition is a "sensory, mental, or physical disability" if it is an abnormality and is a reason why the person having the condition did not get or keep the job in question .... In other words, for enforcement purposes a person will be considered to be disabled by a sensory, mental, or physical condition if he or she is discriminated against because of the condition and the condition is abnormal.
WAC 162-22-020(2) (effective Aug. 12, 1999). The Commission thus extracted from former WAC 162-22-040 the definition of "handicap" found in subsection (1)(b) of that regulation and placed it first in the new WAC 162-22-020(2) definition. The addition of subsection (1)(a) from former WAC 162-22-040 had the aim of placing the WAC 162-22-020(2) definition within the general framework of a disability-based discrimination suitan aim carried over from (and explicit in) former WAC 162-22-040.
¶ 66 That the first paragraph of WAC 162-22-020(2) is the Commission's definition of "disability" is readily apparent when the definition is juxtaposed to its source. In a 1974 *859 amendment to the Rehabilitation Act, a handicapped person was defined as
any person who (A) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (B) has a record of such an impairment, or (C) is regarded as having such an impairment.
Rehabilitation Act Amendments of 1974, Pub.L. No. 93-516, § 111(a), 88 Stat. 1619 (1974); see Colo. Civil Rights Comm'n v. N. Wash. Fire Prot. Dist., 772 P.2d 70, 77 (Colo. 1989) (noting that "[t]he Federal Act clearly was intended to bring within its protection three classes of people who may suffer from discriminatory conduct: those who presently have an impairment, those who have had an impairment in the past, and those who are regarded by others as having an impairment"). The definition from the Rehabilitation Act was incorporated virtually verbatim in the ADA:
The term "disability" means, with respect to an individual 
(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.
42 U.S.C. § 12102(2). In light of its federal counterparts, the first paragraph of WAC 162-22-020(2) is easily isolated as the Commission's definition of "disability":
"The presence of a sensory, mental, or physical disability" includes, but is not limited to, circumstances where a sensory, mental, or physical condition:
(a) Is medically cognizable or diagnosable;
(b) Exists as a record or history;
(c) Is perceived to exist whether or not it exists in fact.
In sum, the "circularity" that the majority cites as grounds for rejecting the WAC definition is simply not inherent in this definition. In any case, if the majority's problem with the definition were truly the "circularity" that the majority points to, the majority could easily remedy that problem by reading the second paragraph of WAC 162-22-020(2) for what it was in former WAC 162-22-040(1)(a) and for what it remains today, a general statement placing the definition of "disability" in the context of the elements of a disability discrimination claim.
¶ 67 A third argument made by the majority in this case to support its replacement of the Commission's definition of "disability" with the ADA definition is that Washington laws against disability discrimination were enacted nearly contemporaneously with the federal laws addressing the same issue. Majority at 852. Rather than supporting the majority's definition, the chronology actually undermines it. Since 1975, the legislature has known that the Commission's definition of the term "disability" was broader than the Rehabilitation Act's definition. Likewise, since 1990, the legislature has known that the Commission's definition was broader than the ADA definition. Nevertheless, even though the legislature has made various amendments to the WLAD since the Commission shifted its definition in 1999 from former WAC 162-22-040(1)(a) into WAC 162-22-020(2), the legislature has never chosen to amend the WLAD to override the Commission's definition. The legislature has clearly acquiesced in the Commission's definition. See, e.g., Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n, 148 Wash.2d 887, 905, 64 P.3d 606 (2003) (holding that the legislature is deemed to have acquiesced in a statutory interpretation when it makes no change for a substantial period of time after the interpretation has been issued). Since statutes are to be interpreted to give effect to legislative intent, Restaurant Development, Inc. v. Cananwill, Inc., 150 Wash.2d 674, 681, 80 P.3d 598 (2003), and an agency's interpretation is entitled to "great weight," Marquis, 130 Wash.2d at 111, 922 P.2d 43, the majority clearly errs by rejecting the entirety of the Commission's definition and replacing it with a completely new definition that the majority thinks advances a better public policy. Contrary to the majority's unsupported assertion, the chronology of enactments reveals that the legislature intended the Commission's definition to control.
¶ 68 Plainly enough, the true target of the majority's dissatisfaction with the definition *860 of "disability" is not the potential disharmony between the two paragraphs in WAC 162-22-020(2); rather, it is the scope of the Commission's definition. As noted above, the legislature delegated the responsibility for defining "disability" to the Commission. How broadly or narrowly to define the term is a public policy choicea choice that must be left to the legislature or the body it charges with administering a statute. Since the legislature has delegated to the Commission the authority to make public policy decisions concerning the WLAD, this court must not disregard the Commission's choice and substitute its own. As shown above, in 1975 the Commission adopted paragraphs (B) and (C) of the Rehabilitation Act's definition of "handicap," but the Commission pointedly modified the Rehabilitation Act's paragraph (A). Rather than defining "handicap" as "a physical or mental impairment which substantially limits one or more of such person's major life activities," the Commission very deliberately replaced the narrower description (of an "impairment which substantially limits one or more of such person's major life activities") with the broader conception of a "condition ... [that] [i]s medically cognizable or diagnosable." The majority, however, rewrites the Commission's definition of "disability," reversing what the Commission, in the deliberate exercise of its statutory authority, drafted and filed 30 years ago.
¶ 69 Before presuming to step into the role of policymaker, the majority would have benefited from a more thorough study of Chicago, Milwaukee, 87 Wash.2d 802, 557 P.2d 307. See supra pp. 847-848. Representing the Commission in Chicago, Milwaukee, Attorney General Slade Gorton introduced the case 30 years ago as one that would "produce the first appellate court construction of the 1973 statute which prohibited discrimination in employment because of handicap." Br. of Appellant at 1 (Chicago, Milwaukee, St. Paul & Pac. R.R. Co. v. Wash. State Human Rights Comm'n, No. 44105 (Wash.1976)). Referring to the conclusion of the Commission's tribunal that Clark "`is and was physically handicapped within the meaning of RCW 49.60.180(1),'" id. at 24 (quoting Tribunal R., Conclusion No. 2 (underlining omitted)), the attorney general provided a clear overview of the statute's purpose:
This conclusion is based upon the public policy contained in the statute. That policy... is to prevent (or eliminate) practices which tend to discriminate against any persons because of "the presence of any sensory, mental, or physical handicap, ..." with respect to such persons' right to obtain and hold employment. RCW 49.60.010, supra, and 49.60.030. The law is to be liberally construed for the accomplishment of this purpose. RCW 49.60.020. It was not intended to become a battlefield for conflicting definitions of the term "handicap." ... [N]o matter how one defines the term "handicap" the initial issue is not whether the worker has a condition which qualifies as a "handicap" for purposes of some abstract definition, but whether the worker has any "sensory, mental or physical" condition which the employer uses as a basis for rejecting him (or her) even though that individual may be perfectly capable of properly performing the work.

Id. at 24-25, 44-45 (emphasis added). The passage would have reminded the majority that public policy is the province of the legislature, that the public policy giving rise to RCW 49.60.180 was the prevention and elimination of discrimination in employment, that the proper focus in applying the statute is on the discriminatory intent of the employer, and that the statute's broad definition of "handicap" was intended to protect against invidious discriminationsituations where an employee has a condition that "the employer uses as a basis for rejecting him (or her) even though that individual may be perfectly capable of properly performing the work." Id. at 25.
¶ 70 It is also instructive to recall that the employer railroad in Chicago, Milwaukee called to the court's attention the Commission's July 21, 1975, adoption of WAC 162-22-040 and asserted that the Commission's interpretation of "handicap" "opens [the] flood gates to much frivolous litigation." Br. of Resp't at 6 (Chicago, Milwaukee, No. 44105). Relying on this same floodgates argument, the majority in the present case *861 rationalizes its rejection of the Commission's definition by claiming that our "scarce judicial resources" will be drained by dockets overburdened with receding-hairline and sprained-finger disability cases. Majority at 852. The majority has not explained why we should attach any weight at all to its floodgates argument, given that in the 30 years since the floodgates supposedly opened, our court system has not been bankrupted by such cases.
¶ 71 I also note that in Chicago, Milwaukee, the railroad used its floodgates argument in an effort to persuade this court to extend to all "handicap" discrimination cases the narrower definition of "handicap" that the Commission had previously adopted in WAC 162-22-030(2) exclusively for the purpose of affirmative action and reporting. Br. of Resp't at 5 (Chicago, Milwaukee, No. 44105). For that purpose, the Commission had defined "handicapped" persons as those "with physical, mental, or sensory impairments that ... [are] material rather than slight; static and permanent in that they are seldom fully corrected by medical replacement, therapy, or surgical means."[2] While the Chicago, Milwaukee court did not address the railroad's invitation to supplant the broad WAC 162-22-040 interpretation of "handicap" with the narrower description in WAC 162-22-030, this court subsequently declined that invitation in Phillips, 111 Wash.2d 903, 766 P.2d 1099. Acknowledging that the WLAD provisions must be liberally construed and that the Commission's definition of "disability" for WLAD claims must be given "great weight," id. at 908, 766 P.2d 1099, the Phillips court held that the narrower definition in WAC 162-22-030 "promulgated by the Commission solely `for affirmative action and reporting purposes'" did not apply to disability discrimination cases under the WLAD. Id. at 907, 908, 766 P.2d 1099. The Phillips court recognized that, "[i]f the affirmative action definition of handicap is used [in lieu of the definition adopted by the Commission for use] in unfair practice cases, a large number of people will be excluded from the protection of the laws against discrimination." Id. at 908, 766 P.2d 1099. The majority in the present case has overturned every principle guiding the Phillips court. Far from liberally construing the WLAD, showing deference to the Commission's interpretation of the discrimination statutes, and rejecting the substitution of a more restrictive definition of "disability" for the Commission's definition, the majority in the present case has gone its own way and set its own policy.
¶ 72 For the foregoing reasons, I must dissent. First, addressing the issue before us, I would affirm the holding of the Court of Appeals that the Pulcino definition of "disability" is inapplicable to disability-based disparate treatment claims:
In our view, [the Pulcino] test works appropriately for reasonable accommodation claims but not for disparate treatment claims. Requiring an employee to demonstrate that her disability substantially interfered with job performance in a reasonable accommodation claim is logical because without the limitation there would be no need for any accommodation....
But an employee claiming disparate treatment is not asking the employer to take any remedial steps on his behalf. Rather, the employee asks only that the employer not terminate him for discriminatory reasons. Logically then, under a disparate treatment theory, the employee should not have to show that his condition substantially limited his ability to perform his job because he is not requesting special *862 treatment based on any limitation. On the contrary, the employee is asking only to be treated like all other employees.
McClarty v. Totem Elec., 119 Wash.App. 453, 469-70, 81 P.3d 901 (2003). I would necessarily disapprove the contrary decision in Roeber v. Dowty Aerospace Yakima, 116 Wash.App. 127, 136-37, 64 P.3d 691, review denied, 150 Wash.2d 1016, 79 P.3d 446 (2003).
¶ 73 Second, I would affirm the Court of Appeals decision reversing the summary dismissal of McClarty's disparate treatment claim and would remand the matter to the trial court for further proceedings. Here, I part company with Chief Justice Alexander's view that summary dismissal was appropriate since "McClarty presented insufficient evidence to survive summary judgment." Dissent (Alexander, C.J.) at 854. The record below plainly shows that Totem Electric's motion for summary judgment on the disability discrimination claim was based exclusively on McClarty's alleged failure to prove the first element of his prima facie casethe existence of a "disability." Totem Electric argued that the Pulcino definition of "disability" applied and that, based on McClarty's deposition testimony that he could do "anything" the job required, CP at 96, McClarty could not satisfy the second prong of the Pulcino definitionproof that his carpal tunnel syndrome "had a substantially limiting effect upon [his] ability to perform his ... job." 141 Wash.2d at 641, 9 P.3d 787; see CP at 110 (Totem Electric's Mem. in Supp. of Summ. J.); CP at 59-61, 63 (Def.'s Reply to Pl.'s Mem. in Opp'n to, and Mot. to Strike Def.'s Mot. for Summ. J.). McClarty met this challenge by correcting Totem Electric's misapplication of the Pulcino definition and by accurately asserting that the governing definition was the one promulgated by the Commission in WAC 162-22-020(2). McClarty then more than adequately supported the first element of his prima facie case by submitting two items satisfying the WAC definition of "disability," as it had been interpreted in our prior case law: he attached his physician's report, which established the diagnosis of "bilateral carpal tunnel," and his sworn declaration stating that Totem Electric's "agent and employee, Rick Sare, [informed him] that [his] having carpal tunnel was the basis for defendant's firing me within 5 hours of their receiving the doctor's diagnosis." CP at 56, 54-55. Totem Electric never disputed the carpal tunnel diagnosis, nor did it contest for purposes of its summary judgment motion McClarty's "allegation that Rick Sare told [him] that Totem's basis for discharging [him] was his diagnosis of carpal tunnel syndrome." CP at 60 n. 4 (Def.'s Reply to Pl.'s Mem. in Opp'n to, and Mot. to Strike Def.'s Mot. for Summ. J.). Because we review de novo the summary judgment motion actually filed by Totem Electric, and not some hypothetical motion based on factual allegations or legal arguments to which McClarty was given no opportunity to respond,[3] we must conclude that Totem Electric was not entitled to summary judgment on its narrow, legally flawed theory that McClarty had failed to satisfy the second prong of the inapplicable Pulcino definition.
*863 ¶ 74 As a final matter, I would acknowledge McClarty's concession that an award of attorney fees under the WLAD must abide the trial court's final determination of the prevailing party on the merits, and contrary to the majority's approach, I would leave to the commissioner or clerk any award of costs on appeal. Riehl v. Foodmaker, Inc., 152 Wash.2d 138, 153, 94 P.3d 930 (2004) (citing McClarty, 119 Wash.App. at 472-73, 81 P.3d 901); RAP 14.6.
Dissenting: FAIRHURST and CHAMBERS, JJ.
NOTES
[1] The apprenticeship program is run by the union and employers.
[2] Before the state court action, Local 76 moved for correction of the caption and was removed as a party defendant.
[3] The dismissal was based on McClarty's inability to satisfy the second prong of the Pulcino definitionproof that his carpal tunnel syndrome "had a substantially limiting effect upon [his] ability to perform his ... job." Pulcino v. Fed. Express Corp., 141 Wash.2d 629, 641, 9 P.3d 787 (2000). As the Court of Appeals observed, McClarty testified in his deposition that the medical restriction applied only to jackhammering and shoveling more than a third of the day, that no such work remained to be performed, and that he could do "anything" required. McClarty, 119 Wash.App. at 468, 81 P.3d 901 (quoting CP at 96).
[4] Under WLAD, RCW 49.60.030, .175, .176, .178,.180, .190, .200, .215, .222 and .225 prohibit discrimination against the disabled. The statutes cover employment, insurance, facility access, etc.
[5] Conversely, the Americans with Disabilities Act of 1990, Pub.L. No. 101-336, 104 Stat. 327 (1990) (codified as amended at 42 U.S.C. §§ 12101-12209) (ADA), one of the WLAD's federal counterparts, explicitly defines "disability."
[6] While WAC 162-22-020 was adopted July 21, 1975, this court's decision in Chicago was not published until over one year later, thus this court had the opportunity to use the definition but did not.
[7] For example, "a prima facie case of racial discrimination," for instance, is generally established "by showing (i) that [the plaintiff] belongs to a racial minority; (ii) that he [or she] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his [or her] qualifications, he [or she] was rejected; and (iv) that, after his [or her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).
[8] Feldblum, a leading disability-rights advocate, observes that the federal Rehabilitation Act of 1973 prohibited discrimination based on "handicap" and not on the basis of physical or mental impairment. She notes that disability-rights advocates were primarily concerned with extending civil rights protections to severely impaired individuals who were the traditional targets of discrimination. See Feldblum, 21 BERKELEY J. EMP. & LAB. L. at 102. The same considerations apply here, given that our legislature extended the WLAD's protections to handicapped persons during the same year that the Rehabilitation Act was enacted by Congress.
[9] In her dissent in Pulcino, Justice Madsen persuasively demonstrates the truth of this statement through an exhaustive examination of other states' disability discrimination laws. See Pulcino, 141 Wash.2d at 654-60, 9 P.3d 787 (Madsen, J. dissenting); cf. Wendy E. Parmet, Plain Meaning and Mitigating Measures: Judicial Interpretations of the Meaning of Disability, 21 BERKELEY J. EMP. & LAB. L. 53, 64 (2000) (noting that, in enacting the ADA, Congress "did not intend that every conceivable condition would constitute a disability.").
[10] Moreover, as a practical matter, there is an abundance of authority interpreting the ADA that, while not binding upon our disposition of state law claims, see Hill, 144 Wash.2d at 180, 23 P.3d 440, they could assist us in construing and applying similar provisions in the WLAD. See, e.g., Toyota Motor Mfg., 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615; 29 C.F.R. § 1630.2(j)(2) (listing factors to consider in determining whether individual is "substantially limited").
[11] The dissents suggest this opinion may be viewed as legislating from the bench. This criticism misses the mark. First, this court's decisions in Pulcino v. Federal Express Corp. and Hill v. BCTI had both recognized that the same WAC definition was circular and could not be effectively applied as written. Second, our legislature did not define disabilitythe definition under review is an administrative agency regulation. We are following our legislature's intent in applying the plain and ordinary understanding, which is assumed when the legislature does not further define a term.
[12] Although RCW 49.60.030(2) does not expressly provide for attorney fees on review, Washington courts have interpreted the statute to authorize such awards. See, e.g., Xieng v. Peoples Nat'l Bank, 120 Wash.2d 512, 533, 844 P.2d 389 (1993) (citing Allison v. Hous. Auth. of City of Seattle, 118 Wash.2d 79, 98, 821 P.2d 34 (1991); Minger v. Reinhard Distrib. Co., 87 Wash.App. 941, 948, 943 P.2d 400 (1997)). The correct answer, however, is that an employee who brings a claim under the WLAD is entitled to attorney fees only if his or her claim is meritorious: "Entitlement to attorney fees cannot be determined until after trial on the merits." Hinman v. Yakima Sch. Dist. No. 7, 69 Wash.App. 445, 453, 850 P.2d 536 (1993). "Where a party has succeeded on appeal but has not yet prevailed on the merits, the court should defer to the trial court to award attorney fees." Riehl v. Foodmaker, Inc., 152 Wash.2d 138, 153, 94 P.3d 930 (2004). Here, the Court of Appeals correctly deferred any award of reasonable attorney fees because McClarty's disparate treatment claim under the WLAD has not yet been decided on the merits. McClarty, 119 Wash.App. at 473, 81 P.3d 901.
[1] Justice Owens is correct that the trial court granted summary judgment primarily because McClarty was unable to show, under the Pulcino disability definition, that his carpal tunnel syndrome had a "`substantially limiting effect upon [his] ability to perform his ... job.'" Dissent (Owens, J.) at 862 (alteration in original) (quoting Pulcino, 141 Wash.2d at 641, 9 P.3d 787). However, the flaw in my colleague's criticism of my position, as she acknowledges, is that this court may affirm the trial court on any ground supported by the record, even when that ground was not considered by the trial court. Nast v. Michels, 107 Wash.2d 300, 308, 730 P.2d 54 (1986) (citing Reed v. Streib, 65 Wash.2d 700, 709, 399 P.2d 338 (1965)); see Dissent (Owens, J.) at 862 n. 3. As the trial record demonstrates, the only evidence of discrimination McClarty presented is his naked assertion in his own declaration that he was told he was fired because of his having carpal tunnel syndrome. Clerk's Papers at 56. As discussed in this opinion, the weight of Washington authority suggests that a plaintiff's unsupported allegation of unlawful discrimination is not sufficient to withstand a summary judgment motion.
[1] TVW, Washington State's Public Affairs Network, Wash. State Supreme Court oral argument, McClarty v. Totem Elec., No. 75024-6 (Jan. 19, 2005), audio recording available at http://www.tvw.org.
[2] Former WAC 162-22-030(2) (1975). In former WAC 162-22-030(1) (1975), the Commission stated that it would recognize a narrower definition of "handicap" for purposes of affirmative action and reporting, since "[t]he emphasis in law enforcement is to leave no one out," whereas "[t]he emphasis in affirmative action must be to avoid including ... so many persons that statistics become meaningless": "None of us is a perfect sensory, mental, or physical specimen. Theoretically, every person faces the possibility of being discriminated against because of handicapalthough some very remotely. It is therefore necessary to restrict the definition of handicap for purposes of affirmative action and reports on the use of handicapped workers to handicaps that are significant and permanent."
[3] I recognize that "[a] party may present a ground for affirming a trial court decision which was not presented to the trial court if the record has been sufficiently developed to fairly consider the ground." RAP 2.5(a). However, on appeal, Totem Electric never broadened its argument to claim that summary judgment was warranted on any ground other than McClarty's alleged failure to satisfy the second prong of the Pulcino definition; moreover, the record before the trial court was limited to that narrow argument. We simply cannot presume to weigh the evidence regarding the additional elements of McClarty's prima facie casethat he "was doing satisfactory work" and "was replaced by a ... person [outside the protected group]"nor should we attempt to assess how the parties would have met their shifting burdens of proof regarding Totem Electric's potential assertion of a nondiscriminatory reason for McClarty's termination. Grimwood v. Univ. of Puget Sound, Inc., 110 Wash.2d 355, 362, 363, 753 P.2d 517 (1988); Chen v. State, 86 Wash.App. 183, 189, 937 P.2d 612 (1997). In fact, it was only in a footnote in its reply brief on the summary judgment motion that Totem Electric introduced three negative work evaluations, two of which were dated after McClarty's termination. The evaluations had no bearing on Totem Electric's Pulcino-based argument, and in any case, they remain untested evidence, having been belatedly and obliquely introduced in a rebuttal brief. CP at 60 n. 4 (Def.'s Reply to Pl.'s Mem. in Opp'n to, and Mot. to Strike Def.'s Mot. for Summ. J.).