FILED
COURT OF APPEALS
DIVISION II

2013 NOV 13 AM 11: 16

STATE OF WASHINGTON

BY_____
        DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| ALEXIS S. SANTOS, a married individual,<br><br>              Appellant,<br><br>v.<br><br>WASHINGTON STATE OFFICE OF THE INSURANCE COMMISSIONER, a governmental entity and agency of THE STATE OF WASHINGTON, a government entity,<br><br>              Respondent. | No. 42431-2-II<br><br><br>UNPUBLISHED OPINION |

TOLLEFSON, J.[*]—Alexis Santos appeals the trial court's order granting summary judgment to his former employer, the Washington State Office of the Insurance Commissioner (OIC), dismissing his claims for (1) disability discrimination under theories of failure to accommodate and disparate treatment, (2) race and/or national origin discrimination under a disparate treatment theory, (3) retaliation, and (4) negligent infliction of emotional distress. Santos also appeals the trial court's order denying his motion to strike his e-mails' and work computer's sexually explicit content. We hold that the trial court erred in dismissing Santos's failure to accommodate disability discrimination claim because when the evidence is viewed in the light most favorable to Santos, as we must do here, he presented a prima facie case and

---

[*] Judge Brian Tollefson is serving as judge pro tempore of the Court of Appeals, Division II, under CAR 21(c).

material issues of fact preclude summary judgment. We further hold that the trial court did not

err in dismissing Santos's remaining claims and in denying his motion to strike. Accordingly,

we reverse the trial court's summary judgment dismissal of Santos's failure to accommodate

disability discrimination claim and remand for trial. We affirm summary judgment dismissal of

the remaining claims and the denial of Santos's motion to strike.

## FACTS

Santos was born in the Philippines and is of Filipino descent. In June 2001, the OIC

hired Santos as an actuary associate. Santos contends that he suffered discrimination throughout

his OIC employment, including unfriendly and embarrassing treatment by senior management,

demotion, unfair denial of a conference travel request, and failure to recognize his service or

achievements.[1] Also, Santos claims he was denied promotions even though he received positive

evaluations, performed above his position, and inquired about his position's reclassification.

When Santos asked his supervisor why he was not reclassified, the supervisor responded he "had

to be white . . . err wait a while."[2] Clerk's Papers (CP) at 344.

During his OIC employment, Santos suffered from "a number of serious medical

conditions, including depression, impulse control disorder, anxiety, panic attacks, hypertension,

and psoriasis." CP at 349. Santos received psychiatric treatment from Dr. Alan Javel from

September 2001 to late in 2006.

On February 10, 2004, Santos requested Internet filtering software for his work laptop; he

did not indicate that his request was medically related. The OIC denied Santos's request. The

---

[1] Because the trial court granted the OIC's motion for summary judgment, we recount the facts in the light most favorable to the nonmoving party, here Santos. *Loeffelholz v. Univ. of Wash.*, 175 Wn.2d 264, 271, 285 P.3d 854 (2012).

[2] The supervisor denied making this comment to Santos.

2

OIC also denied Santos's request to load a personal copy of web filtering software on his laptop. A few days later, Dr. Javel informed the OIC that "Santos has had an increase of physical and psychological symptoms due to recent stress." CP at 442. Dr. Javel recommended, and Santos took, five weeks medical leave.

On August 12, 2005, Santos filed a discrimination claim with the United States Equal Employment Opportunity Commission (EEOC) and the Washington State Human Rights Commission, alleging that the OIC discriminated against him by denying promotional opportunities based on his "age, Asian race and [his] national origin." CP at 121-22.

Four days later, on August 16, Santos informed the OIC that he was "unable to work for an indefinite amount of time" and was under the medical care of Dr. Javel. CP at 392. Santos's supervisor asked him to provide a weekly status update. On August 29, Santos reported that he was unable to work until the end of September. On September 26, Dr. Javel informed the OIC that Santos was being treated for panic disorder and major depression and that he had significant symptoms that made it impossible for him to hold a job.

In November, while Santos was still on a medical leave of absence, Santos and the OIC settled his EEOC discrimination claim through mediation. Santos agreed to drop his EEOC claim if, inter alia, he was reclassified and if his reasonable accommodation request to gradually reenter the workplace was granted. Santos felt that the OIC was further discriminating against him by stalling on his reclassification. But within a few months, the OIC approved Santos's reclassification retroactive to November 14, 2005.

The OIC human resources (HR) manager informed Santos that the OIC needed information about Santos's medical status, medical restrictions, reasonable accommodations, and his ability to perform his position's essential functions. Santos completed an "Employee

3

Reasonable Accommodation and Medical Release Form," describing his disability as major depression, panic attacks, and anxiety. CP at 418. Under the "reasonable accommodation[ ]" section, Santos requested telecommuting at least four days per week. CP at 418. The OIC inquired of Dr. Javel whether Santos was able to perform his job's essential functions, including daily face-to-face interaction with peers and clients. Dr. Javel recommended that Santos gradually resume work. The OIC agreed, and Santos returned to work on May 17, 2006.

On June 30, Dr. Javel released Santos from all restrictions as of July 10. But Dr. Javel recommended an Internet filter for Santos's laptop computer to minimize distractions and anxiety when he traveled.[3] The HR manager called Dr. Javel to clarify this Internet filter request, but they merely traded voice mails. On July 14, the HR manager, Santos, and his union representative met to discuss Santos's Internet filter accommodation request. Describing the July 14 meeting, Santos states that he explained to the HR manager that he needed the filter anytime he was performing work related tasks in the office and while traveling because he could get distracted by the Internet. Santos also declares that he communicated his request for an Internet filter on or about July 14, the same day he met with the HR manager and, as a follow up, he sent an e-mail confirming his request to the OIC information services (IS) department a few days later. The record reflects that on July 20, at 2:05 PM, Santos wrote to IS, "I have been instructed by [the HR manager] to request installation of an [I]nternet filter. I have the software

---

[3] Dr. Javel was under the impression that Santos was covered by a network Internet filter when he used his work laptop at home and at the office.

4

on [compact disc] and it can be installed anytime."[4] CP at 244.

About two hours later, IS personnel noticed suspicious uniform resource locators (URLs) on the network monitoring tool. It showed that Santos's laptop[5] was currently browsing the Internet on suspected adult content sites. The network filter would normally block adult content sites, but the filter was temporarily disabled system wide. The record does not reflect the reason the filter was disabled on that day. IS personnel notified the HR manager, the acting deputy for operations, and the deputy commissioner. The deputy commissioner went to Santos's office, but Santos had already left for the day. Santos's laptop was removed from his office and placed in a locked cabinet.

The OIC placed Santos on home assignment until further notice. A week later, Dr. Javel informed the HR manager that until the recommended filter was provided, Santos was restricted from working at home or the workplace. On September 6, Santos filed a second EEOC claim,

---

[4] The HR manager recounted the meeting and follow-up discussion differently as follows:

> I asked Santos to clarify the need for an "[I]nternet filter." Santos said that he wanted permission to add his own software to his state-issued laptop. Santos told me that he needed the "filter" because when he was on travel status it was easier to use the hotel [I]nternet line rather than using the agency Citrix service to access the agency server. I advised Mr. Santos to submit his request directly to the IS [d]epartment on the agency [personal computer (PC)] Help form but for some reason he did not. On July 17, 2006[,] I met again with Mr. Santos and union representative Wendy Conway and again explained the process for submitting a PC Help form to request the filter software be installed on the laptop. At this meeting Mr. Santos acknowledged that he would submit the PC Help form and that this would satisfy his request for accommodation.

CP at 37.

[5] The record reflects that Santos had only one work computer, a Dell laptop, that he used both at work and while traveling.

alleging that the OIC failed to reasonably accommodate his disability and retaliated against him

for his previous EEOC complaint.[6]

The OIC hired independent computer forensic examiner Jesse Regalado to examine

Santos's computer. Regalado concluded that it contained sexually explicit content, including

images of nude or partially nude persons.[7] The images' source was a variety of sexually explicit

websites. Santos sent sexually explicit personal e-mail and instant messages, including sexually

explicit photographs and apparent solicitations for sex, from his state-issued computer.

The OIC advised Santos that it was considering disciplinary action against him, up to and

including dismissal. The OIC explained the allegations against him, described and provided the

investigative computer report and agency policies that he allegedly violated, and encouraged

---

[6] The EEOC dismissed the discrimination claim after its investigation did not substantiate a violation.

[7] The dissent correctly points out that Regalado located 4,684 images of nude or partially nude persons on Santos's computer. Dissent at 33. However, the number of images may not be an accurate indicator of the pervasiveness of Santos's misuse of his computer.

First, Santos's electronic discovery and computer forensics expert Jonathan Yeh stated that the vast majority of the sexually explicit images were found in a "[t]emp" folder that is "a system generated folder (i.e, automatically created by the computer as opposed to a folder created by a user) used to store data incidental to computer activity, including [I]nternet browsing." CP at 462. Yeh explained:

> [I]t is reasonable to conclude that the "sexually explicit" images found in [the temp folder] were likely automatically saved as a result of someone visiting [I]nternet websites containing the images using the Santos Workstation.
> . . . With regard to the number of images found, it is important to note that the discovery of thousands of images on the Santos Workstation does not mean that Mr. Santos accessed the [I]nternet websites containing such images on thousands of separate occasions.
> . . . Upon a brief examination of the timestamps associated with the image files, many appear to be clustered in time, meaning that they were likely the result of a single unique visit to a website containing multiple images.

CP at 463.

Second, the network filter, which was inexplicably turned off on the day Santos was discovered visiting sexually explicit cites, usually blocked sexually explicit web content. So, it stands to reason that Santos was not regularly accessing sexually explicit websites at work.

Santos to respond to the allegations and present any other information he believed should be considered. Santos did not attend the predisciplinary meeting, but his union representative attended on his behalf.

The OIC terminated Santos's employment, explaining that the disciplinary action was the result of Santos using his work computer to send and receive inappropriate and unauthorized personal e-mails—including sexually explicit e-mail—using the Internet for inappropriate purposes, including sexually explicit information, and for personal, non-work related activities; and abandoning his duties for extensive periods of paid work time to engage in illicit activities. The OIC also noted that it considered all circumstances, including his complete work history and personnel file that revealed a disciplinary action from 2002 in which Santos was fined for using state resources for personal use and using his position to influence a constituent for personal gain.

Santos sued the OIC for disability discrimination, racial/national origin discrimination, retaliation, negligent infliction of emotional distress, and breach of contract. The OIC moved for summary judgment dismissal of Santos's claims. Santos opposed summary judgment and filed a motion to strike any evidence revealing his Internet and e-mail's sexually explicit content as unfairly prejudicial. The trial court denied Santos's motion and granted summary judgment dismissal of Santos's claims. Santos timely appeals the summary judgment dismissal and denial of his motion to strike.

## ANALYSIS

### I. STANDARD OF REVIEW

We review a trial court's order granting summary judgment de novo. *Loeffelholz v. Univ. of Washington*, 175 Wn.2d 264, 271, 285 P.3d 854 (2012). Summary judgment is appropriate

where, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Loeffelholz,* 175 Wn.2d at 271. "A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation." *Ranger Ins. Co. v. Pierce County,* 164 Wn.2d 545, 552, 192 P.3d 886 (2008).

II.     BURDEN-SHIFTING PROTOCOL UNDER WASHINGTON LAW AGAINST DISCRIMINATION (WLAD), CHAPTER 49.60, RCW

To evaluate dispositive motions in discrimination cases, in the absence of direct evidence of discriminatory intent, Washington courts employ a burden-shifting protocol articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801-02, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Kastanis v. Educ. Emps. Credit Union,* 122 Wn.2d 483, 490-91, 859 P.2d 26, 865 P.2d 507 (1993). Under the protocol, the employee has the initial burden of setting forth a prima facie case of employment discrimination. *Kastanis,* 122 Wn.2d at 490. If the employee sets forth a prima facie case, then the burden shifts to the employer to show a legitimate nondiscriminatory reason for the adverse employment action. *Kastanis,* 122 Wn.2d at 490. If the employer meets its burden, then the burden shifts back to the employee to show that the employer's stated reasons for the adverse employment action was a mere pretext for discrimination. *Kastanis,* 122 Wn.2d at 491. If all three facets of the burden of production have been met, the record will contain reasonable but competing inferences of both discrimination and nondiscrimination, and it is the *jury's task* to choose between such inferences. *Carle v. McChord Credit Union,* 65 Wn. App. 93, 102, 827 P.2d 1070 (1992). The employee's task at summary judgment is to show that a reasonable trier of fact could, but not necessarily would, draw the inference that any of the WLAD statutory attributes was a substantial factor in the adverse employment action. *Johnson*

8

No. 42431-2-II

*v. Dep't of Soc. & Health Servs.*, 80 Wn. App. 212, 230 & n.23, 907 P.2d 1223 (1996) (referring to statutory attributes in RCW 49.60.180(2)).

III.  SANTOS'S WLAD CLAIMS

The WLAD prohibits employers from discharging or discriminating in terms or conditions of employment based on, inter alia, a person's age, race, national origin, disability, or opposition to any practices forbidden by this chapter. RCW 49.60.180(2)-(3), .210 (1). It creates at least two different disability discrimination claims: (1) failure to accommodate, i.e., when an employer fails to take steps reasonably necessary to accommodate an employee's disability; and (2) disparate treatment, that is, when an employer discriminates against an employee because of the employee's disability. *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 145, 94 P.3d 930 (2004). Here, Santos alleged both types of disability discrimination as well as racial and/or national origin discrimination based on a disparate treatment theory and retaliation.

A. Failure To Accommodate

Santos argues that the OIC violated the WLAD by failing to provide him with an Internet filter to accommodate his mental disabilities. Because Santos presented a prima facie case for failure to accommodate and genuine issues of material fact remain when we view the evidence, as we must, in the light most favorable to Santos, we hold that the trial court's grant of summary judgment dismissal was error.

The WLAD requires employers to reasonably accommodate a disabled employee unless the accommodation would be an undue hardship on the employer. *Riehl*, 152 Wn.2d at 145. The central concept is that an employer cannot fire an employee for poor job performance if the poor job performance was due to a disability and reasonable accommodation would have rectified the problem. *Parsons v. St. Joseph's Hosp. & Health Care Ctr.*, 70 Wn. App. 804, 807, 856 P.2d

9

702 (1993). The elements of an accommodation claim prima facie case are (1) the employee has a disability; (2) the employee is qualified to perform the job's essential functions; (3) the employee gave the employer notice of the disability; and (4) upon notice, the employer failed to provide or adopt measures that were available to the employer and medically necessary to accommodate the employee's disability. *Riehl*, 152 Wn.2d at 145 (providing similar list of elements of an accommodation claim, though based on superseded definition of "disability").

Our task in reviewing the trial court's grant of summary judgment is to determine whether Santos has produced sufficient evidence to create questions of fact on each element, not whether that evidence is persuasive. *Renz v. Spokane Eye Clinic, P.S.*, 114 Wn. App. 611, 623, 60 P.3d 106 (2002). Accordingly, we do not decide here whether Santos *should* prevail on his accommodation claim. That determination is for the jury.

1. Disability

An employee asserting an accommodation claim must prove that he or she has a disability. *Riehl*, 152 Wn.2d at 145. Here, we apply the *McClarty v. Totem Electric*, 157 Wn.2d 214, 137 P.3d 844 (2006) definition of "disability" because Santos's claim arose between July 6,

10

No. 42431-2-II

2006, and July 22, 2007.[8, 9] Under *McClarty*, Santos was disabled if "he (1) ha[d] a physical or mental impairment that substantially limited one or more of his major life activities, (2) ha[d] a record of such an impairment, or (3) [wa]s regarded as having such an impairment. 157 Wn.2d at 220. "Major life activities" are tasks central to a person's everyday activities.[10] *McClarty*, 157 Wn.2d at 229. Substantial limitation occurs where a person is unable to perform a major life activity that the average person in the general population can perform. *McClarty*, 157 Wn.2d at 229. "[T]he substantial limitation inquiry is not limited to the effects of the impairment in the

---

[8] The WLAD's definition of "disability" has an untidy, but relevant history. Before April 2007, the WLAD did not define "disability" and case law provided the definition. On July 6, 2006, our Supreme Court rejected its earlier definition and adopted the federal Americans with Disabilities Act of 1990 (ADA) definition of "disability" for the WLAD. *McClarty*, 157 Wn.2d at 220, 227-28. Thereafter, the legislature amended the WLAD to provide a broad statutory definition of "disability." LAWS OF 2007, ch. 317, § 2 (codified at RCW 49.60.040(7)). The legislature applied this new definition retroactively "to all causes of action occurring before July 6, 2006, and to all causes of action occurring on or after the effective date" of the act. LAWS OF 2007, ch. 317, § 3. Thus, from July 6, 2006, to July 22, 2007, (the time between the *McClarty* decision and the amendment's effective date), the definition of "disability" under WLAD is controlled by *McClarty*. *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 501-02, 198 P.3d 1021 (2009). Prior to July 6, 2006, and after July 22, 2007, the definition of "disability" is controlled by the statutory definition. *Hale*, 165 Wn.2d at 501-02.

The parties acknowledge the different definitions of "disability," but they apply opposite definitions without much discussion. The OIC applies the definition announced in *McClarty*. Santos applies the statutory definition but contends that his disability would be a triable issue of fact under the *McClarty* definition as well.

[9] On June 30, 2006, Dr. Javel first mentioned the Internet filter disability accommodation by recommending that Santos have, when traveling, an Internet filter for his work laptop to minimize distractions and anxiety. On July 14, Santos explained to the HR manager that he needed the filter any time he performed work related tasks in the office and while traveling. On July 20, IS personnel discovered that Santos was looking at adult content websites on his computer. Santos was immediately placed on home assignment and then terminated on October 3. July 14 is the earliest the OIC became aware that Santos needed an Internet filter disability accommodation. Any failure to provide the Internet filter as a reasonable accommodation occurred between July 14, 2006, and October 3, 2006. Accordingly, Santos's claim arose during the period controlled by the *McClarty* definition of "disability."

[10] Cases interpreting the ADA are instructive for analyzing the WLAD during the period when *McClarty* controlled. 157 Wn.2d at 228-29.

11

workplace." *Rohr v. Salt River Project Agric. Improvement & Power Dist.*, 555 F.3d 850, 858 n.5 (9th Cir. 2009).

Whether Santos was disabled here, is a factual issue that cannot be decided on summary judgment. Santos presented evidence that he struggled with serious mental health issues throughout his OIC employment. Santos's medical conditions included depression, impulse control disorder, anxiety, panic attacks, hypertension, and psoriasis. Santos contends that his medical conditions substantially limited his life activities by creating serious sleep irregularity and problems concentrating. His declaration describes his medical conditions' effect on his daily life:

> I was easily distracted and could not remain focused while trying to complete personal or business tasks. I was fearful, guilty, shameful, and afraid when interacting with others. I had difficulty sleeping at night. I was constantly depressed and lacked motivation . . . and felt like I was worthless.

CP at 349.

Dr. Javel, Santos's treating psychiatrist, diagnosed him with major depressive disorder and impulse control disorder. He confirmed that Santos's disorders negatively and substantially affected his physical, mental, and psychological well being:

> He experiences overwhelming anxiety and depressive swings which he cannot control. He suffers from panic attacks. He is also extremely distract[i]ble and will pursue self destructive behaviors.
> . . . One of the most pronounced symptoms of Mr. Santos'[s] medical conditions is his compulsion to view [I]nternet content in a mindless and involuntary fashion. Instead of working on a specific goal or project, Mr. Santos can easily become distracted by the [I]nternet and will view various forms of [I]nternet content, including content of a sexually explicit nature. . . .
> . . . The etiology of Mr. Santos'[s] compulsion symptom is multi-determinant and therefore cannot be answered [or] explained by looking at any one factor or condition. However, the sexual nature of Mr. Santos'[s] compulsion most likely has a connection to sexual trauma he experienced as a child.
> . . . Mr. Santos'[s] medical conditions and resulting symptoms substantially impair and limit his ability to function on a day to day basis,

including his ability to sleep, to wake up in the morning, to concentrate, to focus on tasks, to communicate and/or to interact with others. In addition, Mr. Santos'[s] medical conditions inhibit his energy levels and ability to motivate himself to perform daily tasks. Overall, Mr. Santos'[s] medical conditions significantly retard his overall physical and mental processing abilities.

. . . As a result of Mr. Santos'[s] medical conditions, and the *substantial limitations they place upon his ability to function on a day to day basis*, it is my professional medical opinion that Mr. Santos suffers from significant and substantial medical conditions that will require ongoing medical treatment for an indefinite period of time.

. . . .

. . . The alleged discrimination experienced by Mr. Santos caused him to experience a plethora of negative symptoms, including feelings of worthlessness, lack of self confidence, lack of motivation, inability to concentrate, problems with distraction, anxiety, panic attacks, suicidal thoughts and tendencies, depression, and significant emotional, mental, and physical pain.

CP at 431-34 (emphasis added).

Steven Williams, a licensed marriage and family counselor with a focus on psychotherapy, began treating Santos in April 2007—six months after his termination. Williams also diagnosed Santos with major depression and impulse control disorder, describing his symptoms as including "depression, worthlessness, difficulty concentrating, fatigue, sleep disturbance, suicide ideation, avoidance, anxiousness, impulsivity, and compulsivity." CP at 493. Williams declared that Santos's symptoms significantly limited his ability to perform numerous day to day activities, such as the ability to concentrate, focus, remain on task, communicate, interact with others, and sleep.

Santos argues that his medical conditions constitute a disability under WLAD. The OIC argues that Santos's inability to "control his prurient obsession . . . at work" is not a disability and that his medical conditions do not constitute a disability because he could perform all the tasks central to a person's everyday activities. Br. of Resp't at 19. The OIC's argument is suggestive of WLAD's federal counterpart, the Americans with Disabilities Act of 1990 (ADA),

13

which expressly excludes certain conditions from its definition of a covered disability, including "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other *sexual behavior disorders*." 42 USC § 12211(b) (emphasis added). Unlike the ADA, WLAD does not exclude certain conditions that would otherwise meet the definition of disability.[11] And even if it did, summary judgment dismissal is not warranted because Santos and his mental health professionals do not characterize Santos's disability as a pornography addiction or other sexual behavior disorder. Santos's diagnosis included major depressive disorder and impulse control disorder.

Whether an employee has a disability is generally a fact question for the jury unless the fact finder could come to only one conclusion. *Pulcino v. Fed. Express Corp.*, 141 Wn.2d 629, 642-43, 9 P.3d 787 (2000), *overruled on other grounds by McClarty*, 157 Wn.2d at 226. Santos's medical conditions and their effects on his ability to work, sleep, and concentrate are documented in his declaration and in the declarations of *two mental health professionals*, including his treating psychiatrist. When we view the evidence in the light most favorable to Santos, as we are required to do, Santos provides competent evidence about his medical conditions and their effect on his daily life from which a reasonable jury could conclude that Santos has a disability under the WLAD. Therefore summary judgment dismissal is not appropriate.

---

[11] The United States House of Representatives Report noted that "[t]hese conditions are physical or mental impairments and would have been included under the ADA, but for this provision." H.R. REP. NO. 101-485, pt. 3, at 76 (1990).

14

2. Ability To Perform the Essential Functions of the Job

The employee must show that he or she was qualified to perform the job's essential functions. *Riehl*, 152 Wn.2d at 145. "An 'essential function' is a job duty that is fundamental, basic, necessary, and indispensable to filling a particular position" and may include conduct or service required of the employee, such as timely and regular attendance. *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 533-34, 70 P.3d 126 (2003). A disabled employee who can perform the essential functions of his or her job with a reasonable accommodation is entitled to that accommodation. RCW 49.60.180; WAC 162-22-020(3), -025(2). But an employer is not required to reassign an employee to an already occupied position, create a new position, alter the fundamental nature of the job, or eliminate or reassign essential job functions. *Riehl*, 152 Wn.2d at 146 n.2; *Pulcino*, 141 Wn.2d at 644. Thus, "'an employer may discharge a [disabled] employee who is unable to perform an *essential function* of the job, without attempting to accommodate that deficiency.'" *Davis*, 149 Wn.2d at 534 (quoting *Clarke v. Shoreline Sch. Dist. No. 412*, 106 Wn.2d 102, 119, 720 P.2d 793 (1986)).

In April 2006, the OIC requested information about Santos's limitations to determine whether he could perform his job's essential functions. The OIC's written "Essential Function Analysis" includes a list of prohibited activities, including illegal use of state property, and an admonition that all employees are responsible for adhering to OIC policies and procedures and the merit system rules. The OIC argues that Santos could not perform the essential functions of the job because he could not follow the OIC policies and laws prohibiting misuse of state property. The OIC further argues that because Santos could not perform the essential functions of his job, it was not required to accommodate the deficiency. The OIC relies on the statement that "'an employer may discharge a [disabled] employee who is unable to perform an *essential*

*function* of the job, without attempting to accommodate that deficiency.'" *Davis*, 149 Wn.2d at 534 (quoting *Clarke*, 106 Wn.2d at 119). Seemingly, the OIC interprets this to mean that employers have no duty to accommodate employees who need assistance in performing essential job functions. We disagree with the OIC's interpretation.

In both *Clarke* and *Davis*, the Supreme Court held that employers were not required to accommodate employees who could not perform the essential functions of their jobs. *Davis*, 149 Wn.2d at 536; *Clarke*, 106 Wn.2d at 119. But neither employee proposed accommodations that would have allowed the employee to perform the essential functions that they could not otherwise perform.[12] The employees' proposed "accommodations" merely eliminated or reassigned essential job functions that they could not perform; but the law does not require employers to accommodate employees in this way. *Davis*, 149 Wn.2d at 534, 536; *Clarke*, 106 Wn.2d at 107-08, 118-19. It was in reference to these circumstances that the Supreme Court stated that "'an employer may discharge a [disabled] employee who is unable to perform an *essential function* of the job, without attempting to accommodate that deficiency.'" *Davis*, 149 Wn.2d at 534 (quoting *Clarke*, 106 Wn.2d at 119). The Supreme Court was not faced with a situation, like here, in which the employee could perform the essential functions of the job with an accommodation, and we do not believe that the court intended to eliminate employers' duty to

---

[12] In *Clarke*, a school district discharged a teacher of severely mentally disabled children, who, due to degenerative eye disease, was unable to perform the essential job functions of maintaining classroom discipline and safety. 106 Wn.2d at 104-06, 119. The teacher recommended the school accommodate his disability by providing additional instructional assistants, reducing the overall number of his students, or reducing the number of behavior problem students in his class. *Clarke*, 106 Wn.2d at 107-08. At issue in *Davis* was whether an employee whose medical condition limited him to a structured, regular 40 hour work week could continue to perform the essential functions of a systems engineer position at Microsoft that required flexibility, frequent travel, and unpredictable, extended hours. 149 Wn.2d 535-36. No accommodation allowed him to do so. His proposed accommodation was to reduce his assigned work to a single account that amounted to less than 50 percent of his original workload. *Davis*, 149 Wn.2d at 536.

16

provide reasonable accommodations in such circumstances. We interpret the court's statement to mean that where employees cannot perform the essential functions under any circumstances, employers need not "accommodate" that deficiency by eliminating, changing, or reassigning essential job duties. Employers have a duty to accommodate employees who can perform the essential functions of the job with reasonable accommodation.[13]

Here, Santos did not request an accommodation that eliminated or transferred essential functions to another employee. Instead, he requested an Internet filter to assist him with his impulse control disorder. Assuming that abstention from misconduct is an essential function of Santos's job, he raises a genuine factual dispute about whether an Internet filter accommodation would assist him to abstain from the prohibited conduct that was a result of his claimed disability. Santos declared that he successfully used an Internet filter on his home computer to prevent him from viewing sexually explicit Internet content or from sending sexually explicit e-mails or images. Whether an Internet filter could assist his impulse control and prevent Santos's violation of OIC policies and misuse of state property so he could perform the essential functions of his job is a disputed issue of fact. Santos provides evidence from which a reasonable jury could find that Santos was capable of performing the essential functions of his job with the aid of an Internet filter.

### 3. Notice of the Disability

An employer's duty to reasonably accommodate an employee's disability does not arise until the employer is aware of the employee's disability and limitations. *Goodman v. Boeing*

---

[13] Our interpretation is consistent with federal law. *See, e.g., U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 393, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002) (stating that the ADA prohibits employers from discriminating against disabled individuals who, with reasonable accommodation, can perform the essential functions of the job); *Clarke*, 106 Wn.2d at 118-19 (construing WLAD in line with federal law).

*Co.*, 127 Wn.2d 401, 408, 899 P.2d 1265 (1995). But "[t]he employee is not required to inform the employer of the 'full nature and extent of the disability.'" *Martini v. Boeing Co.*, 88 Wn. App. 442, 457, 945 P.2d 248 (1997) (quoting *Goodman*, 127 Wn.2d at 408), *aff'd*, 137 Wn.2d 357, 971 P.2d 45 (1999). Ideally, the employer will ascertain the nature and extent of the employee's disability through an interactive exchange of information with the employee. *Goodman*, 127 Wn.2d at 408-09.

Here, the notice requirement is satisfied because the record contains evidence from which a reasonable jury could find that the OIC had notice that Santos suffered from a mental health disability that required an Internet filter accommodation. On August 16, 2005, Santos informed the OIC that he was unable to work for an indefinite amount of time and was under the care of Dr. Javel. Dr. Javel confirmed that Santos had been diagnosed with major depression and panic disorder. After a gradual return to work, Dr. Javel informed the OIC that Santos could return to work full time without any restrictions but that he recommended a filter for Santos's laptop for travel to minimize distractions and anxiety. The OIC HR manager called Dr. Javel to clarify this request for an Internet filter, but they merely traded voice mails. Santos met with the HR manager and clarified that he needed the filter anytime he was doing work—in the office or while traveling. The OIC agreed to install the filter and instructed Santos to send his request directly to the IS department for installation. Santos and the HR manager agreed that this concluded Santos's accommodation request. After the OIC placed Santos on home assignment, Dr. Javel expressly stated to the OIC that Santos was restricted from working at home or at the workplace until the Internet filter he requested was installed. Although Santos did not attend his

predisciplinary meeting, his union representative attended and explained that Santos's personal Internet use was caused by his medical conditions.[14]

The dissent would hold that the OIC's duty to accommodate did not arise because Santos failed to give the OIC notice that he suffered from an "impulse control disorder" and that as a consequence he was unable to stop himself from viewing sexually explicit Internet content without an Internet filter. Dissent at 34, 36. But the dissent's preoccupation with the intimate details of Santos's conditions is unwarranted.

Santos and Dr. Javel informed the OIC that Santos suffered from depression, panic attacks, and anxiety, and explained that Santos needed an Internet filter to reduce distractions and anxiety. Apparently satisfied with the information provided by Santos, the OIC agreed to provide the filter as a reasonable accommodation. The OIC was certainly in a position to seek additional information from Santos before agreeing to his accommodation request, but to claim now that it had no duty to act because it lacked notice of Santos's disability and limitations is questionable. Unlike the dissent, we hold that this record contains evidence from which a reasonable jury could find that the OIC had the requisite knowledge of Santos's disability and limitations to "trigger[ ] the employer's burden to take 'positive steps' to accommodate."[15] *Goodman*, 127 Wn.2d at 408 (quoting *Holland v. Boeing Co.*, 90 Wn.2d 384, 388-89, 583 P.2d

---

[14] The OIC disagreed that the union representative connected Santos's violation of agency policies to his medical conditions. The OIC contends that she merely said that he was aware that he had a problem with visiting sexually explicit Internet websites.

[15] The dissent notes that the majority failed to discuss relevant case law, specifically *Roeber v. Dowty Aerospace Yakima*, 116 Wn. App. 127, 64 P.3d 691 (2003). Dissent at 37. The dissent summarizes *Roeber*, and then asserts "[h]ere, as in *Roeber*, Santos failed to establish that his employer knew he had a disability that required a medical accommodation." Dissent at 38. The dissent's use of *Roeber* lacks factual comparisons and is conclusory, thus, its inclusion is unhelpful. The notice issue is fact intense and does not lend itself well to case illustrations.

621 (1978)).

### 4. Failure To Adopt an Available Medically Necessary Accommodation

Employers are only required to provide accommodation if it is medically necessary. *Riehl*, 152 Wn.2d at 145, 147. "[T]he employee must provide competent evidence establishing a nexus between the disability and the need for accommodation." *Riehl*, 152 Wn.2d at 147-148. Competent evidence will depend on the nature of the disability including the obviousness or subtleness of the disability's symptoms. *Riehl*, 152 Wn.2d at 147-48. The symptoms of Santos's mental health conditions are not obvious and, thus, he is required to produce medical testimony to show that accommodation is medically necessary. *See Riehl*, 152 Wn.2d at 148.

The OIC argues that Santos did not notify it that he had any impairment related to computer use or provide any evidence that an accommodation was "medically necessary." Br. of Resp't at 21. Viewing the facts in the light most favorable to Santos, we disagree with the OIC. Santos's treating psychiatrist, Dr. Javel, recommended that Santos have an Internet filter while traveling to minimize distractions and reduce anxiety. Santos clarified that he needed the filter at the office *and* while traveling to reduce distractions and anxiety. After Santos was assigned to home duty, Dr. Javel informed the OIC that Santos was restricted from working *until* the filter was provided. Dr. Javel stated that Santos's medical conditions required accommodation, including the requested Internet filter:

> In July 2006, I learned that the OIC did not provide Mr. Santos with an [I]nternet filter for traveling nor had the OIC provided Mr. Santos with a filter while he was in his office. As a result, I immediately instructed the OIC that Mr. Santos was medically unable to work until such time as an [I]nternet filter was provided. I provided these directions because without an [I]nternet filter, Mr. Santos compulsion could easily take over and place Mr. Santos in an unhealthy state, including an exacerbation of self destructive thoughts and potentially suicidal tendencies.

CP at 439.

Santos's and Dr. Javel's communications with the OIC satisfied Santos's burden at summary judgment to provide competent evidence that an accommodation was medically necessary. There is no evidence to suggest that the OIC disputed Dr. Javel's medical opinion or that the OIC was considering an accommodation other than the Internet filter recommended and requested by Dr. Javel and Santos. Nor is there evidence that an accommodation, such as the Internet filter, was not feasible or available. In fact, the OIC approved installation of the filter and instructed Santos to make his request to the IS department. Again, Santos produced evidence that an accommodation was available and medically necessary, which precludes summary judgment on the issue.[16]

"[I]t is axiomatic that on a motion for summary judgment the trial court has no authority to weigh evidence or testimonial credibility, nor may we do so on appeal." *No Ka Oi Corp. v. Nat'l 60 Minute Tune, Inc.*, 71 Wn. App. 844, 854 n.11, 863 P.2d 79 (1993). Here, our only determination is that Santos met his burden of production for every element of his prima facie case; it is the role of the jury to determine whether the evidence he produced is persuasive. *Renz*, 114 Wn. App. at 623. Accordingly, we reverse and vacate the trial court's summary judgment dismissal of Santos's failure to accommodate claim and remand for further proceedings.

---

[16] Division One recently held that under the 2007 statutory amendments to WLAD, "'[m]edical necessity' is no longer the sole basis for a right to accommodation." *Johnson v. Chevron U.S.A., Inc.*, 159 Wn. App. 18, 29-30, 244 P.3d 438 (2010). Because those amendments do not apply to this case, we still require Santos to prove that an accommodation was medically necessary.

B. Racial and/or National Origin Discrimination and Disability Discrimination under Theories of Disparate Treatment

Santos next alleges that the trial court erred by granting summary judgment dismissal of his claims of racial and/or national origin discrimination and disability discrimination under disparate treatment theories. We disagree.

RCW 49.60.180 prohibits discharging or discriminating against any person in terms or conditions of employment because of status in a protected class, including race, national origin, or disability. "The purpose of showing disparate treatment is to create an inference of discriminatory animus because direct evidence of discrimination is rarely available." *Johnson*, 80 Wn. App. at 227 n.20. Unlike Santos's reasonable accommodation claim, which focuses on whether the OIC should have treated him differently from other employees to accommodate his disability; here, the central issue is whether the OIC acted with discriminatory motive or intent in discharging Santos. *See Parsons*, 70 Wn. App. at 807 (distinguishing failure to accommodate from disparate treatment claim). To establish a prima facie case of discrimination due to disparate treatment, an employee must show that he belongs to a protected class and was treated less favorably in the terms or conditions of his employment than a similarly situated nonprotected employee doing substantially the same work. *Johnson*, 80 Wn. App. at 226-27. Then, if the employer proffers a legitimate nondiscriminatory reason for its action, the employee must produce evidence indicating that the employer's reason is pretextual. *Johnson*, 80 Wn. App. at 227.

1. Racial and/or National Origin Discrimination

We consider Santos's claim of racial and/or national origin discrimination under a disparate treatment theory. Santos must show that he is a member of a protected racial/national

origin class and that he was treated less favorably than similarly situated nonprotected employees. *Johnson*, 80 Wn. App. at 226-27. It is undisputed that Santos belongs to a protected racial and national origin class; he is Filipino and was born in the Philippines. Santos argues that the following circumstances demonstrate that he was treated less favorably than his colleagues and support an inference that racial and/or national origin discrimination was a substantial factor in his termination: (1) senior management's dislike for him at the beginning of his employment; (2) his "demotion" in the OIC organizational chart; (3) his supervisor's statement that he had to be white to be reclassified; (4) the OIC's refusal to allow him to travel to Orlando while allowing a white employee to do so; (5) the OIC's failure to promote him despite repeated requests; (6) the OIC's disregard of the EEOC mediation settlement; (7) the OIC's response to his request for an Internet filter; and (8) the OIC's decision to terminate his employment for violating OIC's Internet and computer policies, which he alleges is harsher discipline than imposed on other employees. Arguably, based on these circumstances, Santos presents a prima facie case of racial and/or national origin discrimination.

Assuming Santos satisfied his initial prima facie burden, the burden shifts to the OIC to present evidence of a legitimate nondiscriminatory explanation for discharging him. *Johnson*, 80 Wn. App. at 227. The chief deputy stated in Santos's termination letter that the OIC discharged Santos for misconduct related to inappropriate computer and Internet use and dereliction of duty. Santos's dismissal letter notes that he had previously been disciplined for using state resources for personal use and using his position to influence a constituent for personal gain. The chief deputy concluded that Santos's offenses were extremely serious and that although employee misuse of state resources is unacceptable, the sexually explicit nature of Santos's inappropriate activity increased the seriousness of the violations. The chief deputy determined that he could no

23

longer trust Santos's judgment and that the only appropriate action was to discharge him. These are legitimate nondiscriminatory reasons for terminating Santos's employment; thus, the burden shifts back to Santos to show that the OIC's articulated reasons were pretext and that his race and/or national origin was a substantial factor is his termination. *See Johnson*, 80 Wn. App. at 227, 230 & n.23. This Santos fails to do.

An employee may demonstrate pretext by showing that the employer's articulated reasons had no basis in fact, were not really motivating factors for its decision, were not temporally connected to the adverse employment action, or were not motivating factors in employment decisions for other employees in the same circumstances. *Kuyper v. Dep't of Wildlife*, 79 Wn. App. 732, 738-39, 904 P.2d 793 (1995). For example, one test for pretext is whether an employee outside the protected class committed acts of comparable seriousness but was not demoted or similarly disciplined. *Johnson*, 80 Wn. App. at 227. Summary judgment may be granted in favor of an employer even when the employee has created a weak issue of fact concerning pretext, if abundant and uncontroverted independent evidence indicates that no discrimination occurred. *Fulton v. Dep't of Soc. & Health Servs.*, 169 Wn. App. 137, 161-62, 279 P.3d 500 (2012).

As evidence of less favorable treatment, Santos points to eight other OIC employees who were disciplined for misusing their work computers or the Internet during Santos's OIC employment. But this evidence does not support his claim of pretext. The record shows only that four employees received discipline less harsh than discharge: one was reprimanded and the others were fined between $450 and $900. The record does not reflect the disciplinary action taken against the other four employees or identify the race or national origin (or other protected class status) of any of the disciplined employees. Moreover, the record does not show that the

other employees' misuse of their computers included sexually explicit uses, which the OIC stated was a motivating factor in Santos's termination because it increased the seriousness of Santos's violations.[17]

The closeness of the comparators is generally a question for the trier of fact. *Johnson*, 80 Wn. App. at 229-30. But on the record before us, it is questionable whether Santos's coworkers should be considered comparators at all. In light of the sparse information about the comparators, any inference of pretext raised by the comparators' more favorable treatment is extremely weak. This extremely weak evidence of pretext fails to raise a reasonable inference that the OIC's articulated legitimate reason for Santos's discharge (misconduct that Santos admits) was pretextual. Thus, the OIC was entitled to summary judgment dismissal of Santos's racial and/or national origin discrimination claim.

2. Disability Discrimination under Disparate Treatment Theory

We consider Santos's disability discrimination claim also under a disparate treatment theory. Santos must show that he is a member of the protected class, here, that he has a disability as it is defined for purposes of the WLAD. *See Johnson*, 80 Wn. App. at 227 (applying disparate treatment elements to racial discrimination claim). In our analysis of his accommodation claim, we determined that Santos presented evidence creating a material issue of fact about whether he is disabled. We will not duplicate that analysis here.

Next, Santos must show that he was treated less favorably than similarly situated nondisabled employees. *See Johnson*, 80 Wn. App. at 227. This he fails to do. The record does

---

[17] The other employees' disciplinary letters reflect non-sexually explicit inappropriate use of state resources for purposes such as sending public disclosure requests, excessive instant messages exchanged between coworkers, personal e-mails, long distance telephone calls, personal business, and use of the Internet to research child custody and family health issues.

not reflect whether any of the OIC employees disciplined for personal computer use were disabled. Many of the other circumstances that supported Santos's prima facie case of racial discrimination do not similarly support his disability claim. For example, his supervisor's statement about Santos needing to be white for a promotion and a white coworker traveling to Orlando after he was denied the opportunity do not relate to his disability. Further, senior management's dislike of him and his "demotion" allegedly occurred years before Santos informed the OIC that he had a disability. It is unreasonable to assume that the OIC knew about his disability before he informed them of it because the mental disability he allegedly suffers from is not obvious. The lone circumstance relating to Santos's disability is his allegation that the OIC acted slowly in responding to his Internet filter accommodation request. But that does not reflect that Santos was treated differently than an employee without a disability. Deficiencies related to the OIC's response to his Internet filter request were appropriately addressed in his accommodation claim.

Before the burden shifts to the OIC to articulate a legitimate nondiscriminatory reason for the discharge, Santos must establish a prima facie case of discrimination based on the OIC's less favorable treatment of him when measured against the OIC's treatment of nondisabled

employees.[18] He has produced no such evidence. Santos's disparate treatment disability

discrimination claim fails for lack of a prima facie case. Thus, the trial court properly dismissed

the claim on summary judgment.

C. Retaliation

Santos also contends that the trial court erred in granting summary judgment dismissal of

his retaliation claim. We disagree.

The WLAD does not allow an employer "to discharge, expel, or otherwise discriminate

against any person because he or she has opposed any practices forbidden by this chapter."

RCW 49.60.210(1). The three step burden-shifting framework discussed earlier also applies to

retaliation claims. *Renz,* 114 Wn. App. at 618-19. To establish a prima facie case of retaliation,

Santos must show that he engaged in a statutorily protected activity, the OIC took adverse

employment action against him, and there is a causal link between the protected activity and the

adverse action. *Short v. Battle Ground Sch. Dist.,* 169 Wn. App. 188, 205, 279 P.3d 902 (2012).

Proximity in time between a protected activity and the adverse employment action is a factor

suggesting retaliation. *Burchfiel v. Boeing Corp.,* 149 Wn. App. 468, 482, 205 P.3d 145 (2009).

Satisfactory work performance and evaluations prior to discharge is also a factor suggesting

---

[18] Santos alleges that his inappropriate use of his work computer and paid work time to visit sexually explicit websites, send sexually explicit pictures and e-mail messages, and arrange for intimate encounters was the result of his mental disability. Conduct resulting from a disability is considered to be part of the disability rather than a separate basis for termination. *Riehl,* 152 Wn.2d at 152. However, in the absence of a prima facie case of disparate treatment, the burden did not shift to the OIC to articulate a legitimate nondiscriminatory reason for Santos's discharge. On the other hand, the accommodation requirement protects employees from being discharged for poor job performance that could be rectified by an accommodation. *Parsons,* 70 Wn. App. at 807. An accommodation claim does not require an employee to show less favorable treatment or discriminatory motive or intent on the part of the employer. *See Riehl,* 152 Wn.2d at 145.

retaliatory motivation. *Estevez v. Faculty Club of the Univ. of Wash.*, 129 Wn. App. 774, 799, 120 P.3d 579 (2005).

It is undisputed that Santos's termination constitutes adverse employment action by the OIC. Santos identifies various protected activities that he argues were sufficiently close in time to show a casual nexus with his termination. Br. of Appellant at 42. These include his (1) filing an EEOC claim on August 12, 2005, (2) disagreeing with the OIC about the terms of the proposed settlement of the EEOC claim, (3) requesting a reasonable accommodation (approximately July 14, 2006), (4) implying that he may sue the OIC for failure to accommodate his disability (e-mail August 5, 2006), and (5) filing a second EEOC claim on September 6, 2006. Santos also argues that his satisfactory work performance evaluations support an inference that his termination was retaliation for the protected activities. These allegations established a prima facie case of retaliation and, thus, the burden of production shifted to the OIC to rebut it. *Burchfiel*, 149 Wn. App. at 483.

The OIC was required to show a legitimate nonretaliatory reason for the employment decision. *Burchfiel*, 149 Wn. App. at 483. Here, the OIC articulated that Santos was terminated because of his inappropriate personal use of his work computer and the Internet, which use included sexually explicit content. Because the OIC articulated a nonretaliatory reason for the adverse employment action, the burden shifted to Santos to produce evidence supporting a reasonable inference of pretext. *See Estevez*, 129 Wn. App. at 797-98. This he does not do.

Although the short time between the protected activities and his termination is sufficient to raise a prima facie case, it is insufficient to meet his burden of production to show that the OIC's reasons for terminating his employment following discovery of his inappropriate Internet usage were a pretext. Any inference of discriminatory motive garnered from the close proximity

28

of protected activities and his termination is nullified by Santos's intervening misconduct that formed the articulated basis for the OIC's decision to discharge him.

The OIC first discovered Santos's misuse of his work laptop on July 20, 2006, and then immediately placed him on home assignment pending an investigation. After the investigation and predisciplinary hearing, Santos was terminated on October 3, 2006. Santos's evidence of pretext is especially weak in light of the OIC's articulation that it fired Santos for misconduct that he admits. We hold that Santos did not produce evidence sufficient to support a reasonable inference of pretext. Accordingly, the trial did not err in dismissing Santos's retaliation claim on summary judgment.

IV.    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Santos also asserts that the trial court erred by granting summary judgment dismissal of his claim for negligent infliction of emotional distress. We disagree. The elements of this claim are duty, breach, proximate cause, damage, and objective symptoms of emotional distress. *Strong v. Terrell*, 147 Wn. App. 376, 387, 195 P.3d 977 (2008).

Here, the OIC did not have a duty to avoid inflicting emotional distress on Santos while it evaluated whether he was entitled to reclassification at higher pay. *See Johnson*, 80 Wn. App. at 230 (stating that employers do not owe a duty to avoid infliction of emotional distress on its employees when responding to employment disputes); *see also Francom v. Costco Wholesale Corp.*, 98 Wn. App. 845, 864, 991 P.2d 1182 (2000) (same). Nor may Santos maintain a separate claim for negligent infliction of emotional distress based on the OIC's alleged failure to provide the Internet filter because that is the same factual basis as the accommodation claim, his surviving WLAD claim. *See Francom*, 98 Wn. App. at 864-65 (holding that a plaintiff may not maintain a separate and duplicative claim for emotional distress based solely on the same facts

that support a claim under the WLAD, which permits damages for emotional injuries); *Haubry v. Snow*, 106 Wn. App. 666, 678, 31 P.3d 1186 (2001) (holding that the plaintiff's negligent infliction of emotional distress claim failed because its factual basis was not distinct from the factual basis for the plaintiff's sexual harassment and discrimination claims). Accordingly, the trial court did not err in granting summary judgment dismissal of Santos's negligent infliction of emotional distress claim.

V.     EVIDENTIARY RULING

Finally, Santos contends that the trial court erred in denying his motion to strike the sexually explicit content of his e-mail and Internet use under ER 403. Ordinarily we review a trial court's evidentiary rulings for abuse of discretion, but we review rulings made in conjunction with a summary judgment motion de novo. *Momah v. Bharti*, 144 Wn. App. 731, 749, 182 P.3d 455 (2008) (citing *Folsom v. Burger King*, 135 Wn.2d 658, 662-64, 958 P.2d 301 (1998) (holding that we review all evidence presented to the trial court, conduct the same inquiry, and reach our own conclusion about the admissibility of evidence)).

Under ER 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Evidence is unfairly prejudicial if it is likely to stimulate an emotional response rather than a rational decision by the jury. *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 671, 230 P.3d 583 (2010).

Here, Santos alleged that the OIC's decision to discharge him was retaliatory and discriminatory. The OIC responded that Santos was fired for a legitimate reason—misuse of state property including personal Internet use of a sexually explicit nature. The OIC's termination letter articulated that the sexually explicit content increased the seriousness of

Santos's violations for which he was fired. Excluding the content of Santos's Internet use would significantly impede the OIC's defense and prevent it from introducing the basis of its termination decision. Thus, the content of Santos's e-mail and Internet use is extremely probative and the value outweighs any unfair prejudice to Santos. We hold that the trial court did not err in denying Santos's motion to strike the content of his computer and Internet use.[19]

We reverse the trial court's order granting summary judgment dismissal of Santos's failure to accommodate claim and remand for further proceedings on that claim. We affirm the trial court's grant of summary judgment dismissing Santos's remaining claims and its denial of Santos's motion to strike.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

TOLLEFSON, J.P.T.

I concur:

JOHANSON, J.

---

[19] Santos also contends that the trial court should not have considered his sexual history. The record does not indicate that the trial court considered his sexual history; but regardless, the motion to strike did not request it be stricken.

No. 42431-2-II

WORSWICK, C.J. (dissenting in part) — While I concur with my colleagues in believing that the trial court correctly dismissed Alexis Santos's race and/or national origin discrimination, retaliation, disparate treatment, and negligent infliction of emotional distress claims, I do not believe Santos has presented a prima facie case for failure to accommodate. Additionally, Santos's claim that his employer discriminated against him when it fired him for using his state-issued computer during work hours to visit pornographic websites for hours on end, solicit sex from strangers, send and receive sexually explicit pictures via e-mail, and conduct personal business, trivializes the claims of disabled persons who actually suffer discrimination. Accordingly, I dissent on this issue.

ADDITIONAL FACTS

In describing Santos's condition, the majority points out that he suffered from a number of serious medical conditions and received intermittent treatment from psychiatrist Dr. Alan Javel. And in describing the discovery of improper material on Santos's laptop, it states that "Santos sent sexually explicit personal e-mail and instant messages, including sexually explicit photographs and apparent solicitations for sex, from his [S]tate-issued computer." Majority at 6. These characterizations minimize Santos's pornography viewing, his inability to distinguish between state resources and his own personal computer, and the extent to which he abused state resources.

> In a declaration supporting his opposition to summary judgment, Santos admitted that
>
> [a]t some point during my employment at the [Office of the Insurance Commissioner (OIC)], I began trying to alleviate my pain and suffering through compulsive internet behavior. I would search the internet for sexually explicit images. I entered chat rooms and communicated with strangers about sexual acts.

32

I emailed strangers about engaging in sex acts. When I engaged in such conduct,
I forgot about the pain I was experiencing in my day to day life.

Clerk's Papers (CP) at 354. Santos also admitted that "[o]n many occasions, [he] was unable to control his behavior and viewed internet content and/or sent personal emails without distinguishing between his personal and state issued computer." CP at 186.

A computer forensic expert located 4,684 image files of nude or partially nude persons on Santos's state-issued computer. Moreover, investigation revealed that Santos used instant messaging while at work to arrange meetings with sexual partners and sent numerous e-mails from his work computer containing sexually explicit images. Perhaps most egregiously, Santos used his state computer to arrange a meeting with a stranger for sex in Chicago where Santos was to travel for state business.

Although none of these facts is dispositive, taken together they paint a more accurate picture of the decision Santos's employer faced when it opted to terminate him for abusing state resources.

FAILURE TO ACCOMMODATE

The Washington Law Against Discrimination (WLAD), ch. 49.60 RCW, forbids employers to refuse to hire, discharge, bar from employment, or discriminate against a person based on disability. RCW 49.60.180(1)-(3). Under RCW 49.60.180, a disabled employee may assert an accommodation claim based on the employer's failure to make reasonable accommodations for the employee's disability. *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 145, 94 P.3d 930 (2004). The elements of an accommodation claim are (1) the employee had a disability, (2) the employee was qualified to perform the essential functions of the job with or without reasonable accommodation, (3) the employee gave the employer notice of the disability,

33

and (4) the employer failed to adopt measures reasonably necessary to accommodate the disability. *See Riehl*, 152 Wn.2d at 145 (providing similar list of elements of an accommodation claim, though based on superseded definition of "disability").

Leaving aside whether a constant compulsion to view pornography constitutes a "disability," Santos's claim fails because—contrary to the majority's assertions—he never notified OIC of his "impulse control disorder" and *the need for a medical accommodation related to that disorder*. And while the majority appears to infer that OIC should have intuited that Santos's medical conditions required accommodation in the specific form of an internet filter powerful enough to block the user from excessively watching pornography, sending explicit sexual images via e-mail, or arranging sex via instant messaging, I simply cannot conclude that that inference is reasonable.

Here, the majority erroneously connects Santos's vague assertions to OIC about his medical conditions and need for an internet filter, to OIC's potential knowledge of Santos's condition, thus allowing Santos's claim to survive summary judgment. The majority states that the "notice requirement is satisfied because the record contains evidence from which a reasonable jury could find that the OIC had notice that Santos suffered from a mental health disability that required an [i]nternet filter accommodation." Majority at 18. It points out that (1) in February 2004, Dr. Javel recommended a medical leave of absence because Santos had physical and psychological symptoms due to stress; (2) Santos told the OIC in August 2005 that he was unable to work for an indefinite amount of time and was under Dr. Javel's care; (3) Dr. Javel confirmed for the OIC that Santos had been diagnosed with major depression, panic attacks, and anxiety; (4) Dr. Javel recommended Santos have an internet filter for when he was travelling; and (5) Santos told OIC he needed a filter anytime he was doing work.

34

In the majority's opinion, despite Santos's and Dr. Javel's failure to inform OIC of Santos's impulse control disorder or the disabling extent of his pornography addiction, the above stated evidence is sufficient such that a reasonable jury could find that the OIC had notice that he suffered from mental health conditions that required that he not have access to unfiltered internet content. Looked at more closely, however, this evidence fails to establish that the OIC knew or should have known that Santos could not work without an internet filter for medical reasons.

The 2004 fax from Dr. Javel simply stated, "Mr. Santos has had an increase of physical and psychological symptoms due to recent stress. I recommend that he be off work until 3/29/04." CP at 442. In September 2005, Dr. Javel informed the OIC that "Mr. Santos is being treated by me for Panic Disorder and Major Depression. He still has significant symptoms which make it impossible for him to hold a job." CP at 444. In order for Santos to receive leave donated from his colleagues, Dr. Javel told the OIC in October 2005 that Santos suffered from major depression and hypertension. When Dr. Javel concluded that Santos was able to return to work "with accommodations," he simply told the OIC that "[t]he best accommodation would be for him to telecommute 4 out of 5 days per week, with a different office location when he does come in." CP at 448. And after the OIC sought clarification on Santos's medical condition and need for accommodation, Dr. Javel simply told the OIC in May 2006 that "[i]f Mr. Santos needs to interact with peers and clients face-to-face on a daily basis, then I suggest that he resume work at the workplace for 2 days per week for the first 2 weeks, then 3 days per week for the next 2 weeks, then 4 days per week for the next 2 weeks." CP at 452. Finally, in June 2006, Dr. Javel sent a note to OIC stating, "Mr. Santos may resume full time duties with no restrictions as of July 10, 2006. I also recommend that he have an internet filter for his laptop when he is traveling, to minimize distractions and minimize anxiety." CP at 454.

35

*Nowhere* in any of these communications does Dr. Javel mention Santos's "impulse control disorder" or explain why internet filtering software is a medically necessary accommodation. Santos likewise failed to inform the OIC of his "impulse control disorder" or connect a need for an internet filter to the disorder. As such, there is simply no evidence that the OIC knew of Santos's "impulse control disorder" or that accommodating the disorder required an internet filter.[20] And while an "employee is not required to inform the employer of the 'full nature and extent of the disability,'" *Martini v. Boeing Co.*, 88 Wn. App. 442, 457, 945 P.2d 248 (1997) (quoting *Goodman v. Boeing Co.*, 127 Wn.2d 401, 408, 899 P.2d 1265 (1995)), *aff'd*, 137 Wn.2d 357, 971 P.2d 45 (1999), an employer's duty to reasonably accommodate does not arise until the employer is aware of the employee's disability and limitations. *Goodman*, 127 Wn.2d at 408. Santos's accommodation claim necessarily fails as he and his medical providers never informed the OIC of the medical reasons and necessity of having a filter installed.

In reviewing an order for summary judgment, this court must draw "[a]ll *reasonable* inferences . . . in favor of the nonmoving party upon summary judgment" but "[u]nreasonable inferences that would contradict those raised by evidence of undisputed accuracy need not be so drawn." *Snohomish County v. Rugg*, 115 Wn. App. 218, 229, 61 P.3d 1184 (2002). Here, it is unreasonable to infer that OIC had the requisite knowledge necessary to create a prima facie case for failure to accommodate.

Additionally, although the majority fails to discuss any case law related to the notice element of Santos's accommodation claim, Division Three of this court has provided useful analysis concerning a plaintiff failing to meet that element on summary judgment in *Roeber v.*

---

[20] Santos presented evidence at *summary judgment* that he had been medically diagnosed with an impulse control disorder. But whether an employee has a disability and whether an employer has notice of the need to accommodate a disability are two separate inquiries.

*Dowty Aerospace Yakima*, 116 Wn. App. 127, 64 P.3d 691 (2003). In that case, an employee was fired in May 1998 for making violent threats and fighting with a coworker on a single occasion. *Roeber*, 116 Wn. App. at 132. The employee eventually filed a failure to accommodate disability claim alleging that he was "discharged because he suffers migraine headaches and a depressive disorder." *Roeber*, 116 Wn. App. at 133.

The employee presented evidence prior to summary judgment that (1) his company's human resources director recommended he see a therapist because he was suffering from depression; (2) he participated in counseling sporadically from 1992 to 1995; (3) feeling overwhelmed at work in 1997, the employee had his treating physician send a letter to his employer requesting that his employer assist him "in his efforts to maintain his employment under less stressful conditions"; (4) the same letter stated that the employee had talked to his supervisors on multiple occasions "to try to remedy the problems, but that he had not gotten any response." *Roeber*, 116 Wn. App. at 134.

In analyzing whether the trial court properly dismissed the employee's claim on summary judgment for failure to notify, Division Three reasoned,

> Even assuming [the employee] had complained to his supervisors as often as he indicated in his affidavit, the record does not show that [his employer] was given notice that his migraines and depressive disorder were substantial limitations. The only letter from a medical practitioner indicated that [his] condition was successfully treated with medication. He was never hospitalized or otherwise substantially limited in his ability to perform his job. Although he claims he sometimes missed work or had to leave work due to his headache pain, he also admits his injections of migraine medication usually prevented the headaches from developing or soon brought relief. The record simply does not support his contention that he gave notice to [his employer] that he was significantly limited in his ability to perform his job.

*Roeber*, 116 Wn. App. at 140. And, in conclusion, the court held that "when the employee fails to establish either that a specific reasonable accommodation was available or that

accommodation was medically necessary, the burden of production never shifts to the employer to show that the proposed solution was not feasible. In such case, the employer is entitled to judgment as a matter of law." *Roeber*, 116 Wn. App. at 141 (citation omitted).

Here, as in *Roeber*, Santos failed to establish that his employer knew he had a disability that required a medical accommodation. While the OIC was aware that Santos was suffering from depression and anxiety, and that Santos desired an internet filter, it is simply unreasonable to expect that the OIC should have inferred that an internet filter was medically necessary to control a disorder it was unaware that Santos suffered from. Accordingly, I believe Santos fails to establish a prima facie case for his accommodation claim.

POLICY CONSIDERATIONS

As a final matter, I note that judicial bars to accommodation and discrimination claims are designed to "ensure that scarce judicial resources are available to those most in need of the WLAD's protections, rather than persons with receding hairlines." *McClarty v. Totem Elec.*, 157 Wn.2d 214, 230, 137 P.3d 844 (2006). Claims such as Santos's "'trivializ[e] the discrimination suffered by persons with disabilities'" that seriously affect their lives. *McClarty*, 157 Wn.2d at 230 (quoting *Pulcino v. Fed. Express Corp.*, 141 Wn.2d 629, 652, 9 P.3d 787 (2000) (Madsen, J., dissenting)).

As Justice Brennan once noted, "We need not leave our common sense at the doorstep when we interpret a statute." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989). Common sense dictates that when the Washington legislature passed the WLAD, it did not envision requiring an employer to accommodate an employee's

No. 42431-2-II

pornography addiction.

_____
WORSWICK, C.J.